Robert Anthony REED, III, et al., Plaintiffs,

v.

James A. RHODES, Cleveland City Board of Education, Ohio State Board of Education, et al., Defendants.

No. C73–1300.

United States District Court, N. D. Ohio, E. D.

July 25, 1980.

James L. Hardiman, Theresa Demchak, Cleveland, Ohio, Thomas I. Atkins, N.A.A. C.P., New York City, for plaintiffs.

Michael Sussman, Civil Rights Division, Dept. of Justice, Washington, D. C., for amicus curiae.

Daniel R. McCarthy, Cleveland, Ohio, for Special Master.

James P. Murphy, George I. Meisel, William H. Baughman, Jr., Squires, Sanders & Dempsey, Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, John H. Bustamante, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

The process of desegregating the Cleveland city school district is now in a critical phase. The fundamental issue presented to the Court is whether the Cleveland defendants have both the commitment and the capacity to effectively, efficiently, and lawfully implement this Court's Remedial Order of February 6, 1978 ("Remedial Order"), and thereby vindicate the Constitutional rights of the plaintiffs by eradicating the effects of past intentional segregative conduct. In addition, the Court is called upon to determine whether the defendants should be cited for civil contempt for their continuing failure to comply with court orders.

The issues are before the Court pursuant to two separate requests, one by the Special Master and another by the plaintiffs. On January 31, 1980, the Special Master submitted a lengthy report which detailed serious deficiencies in the implementation of the Remedial Order. The Special Master urged this Court "to conduct hearings regarding continuing problems which appear to be impairing full and effective implementation of the educational components and ancillary relief ordered by the Court as an integral part of its desegregation remedy." Report Regarding Remedial Order and Implementation Recommendations By the Special Master, filed January 31, 1980 ("Special Master's Report of January 31, 1980").

The seriousness of the problems addressed by the Special Master prompted this Court to conduct hearings on the Cleveland defendants' state of preparedness for Phase II implementation[1] from March 11 to 14, 1980. The Court scheduled additional hearings on April 1, 1980, to address the remaining aspects of the Special Master's Report of January 31, 1980.

On March 25, 1980, less than ten days after the commencement of Phase II desegregation, the plaintiffs filed a motion requesting this Court to order the members of the Cleveland Board of Education, the Superintendent of the Cleveland Public Schools, and the Deputy Superintendent for Desegregation Implementation to show cause why they should not be found in civil contempt for failure to comply with Court orders relating to desegregation implementation. The plaintiffs' motion proposed as a sanction the imposition of a "partial receivership."

In response to the plaintiffs' motion, this Court ordered that hearings on civil contempt be conducted commencing on April 7, 1980. This Court specified nineteen separate factual issues which would be aired at the hearings,[2] consisting of matters raised

---

1. The system wide desegregation of the Cleveland public schools is being implemented in three phases. Phase I was implemented in the Fall of 1979 and involved the Kennedy Marshall cluster (except for junior high schools), the Collinwood cluster, and the East Tech–South cluster junior high schools. Phase II was scheduled to begin at the start of the second semester in February, 1980 but was pushed back to March due to the strike by the Cleveland teachers. Phase II consists of the desegregation of all junior high schools. Phase III is to be implemented in the Fall of 1980 and includes the elementary and high schools of the remaining five clusters.

2. The Order of March 28, 1980 provided that the following areas would be addressed during hearings on civil contempt:

   1. Whether local defendants under Phase I implementation omitted or failed to implement

by both the plaintiffs and the Special Master. Also included were various areas that

in a manner consistent with or which would reasonably effectuate certain educational programs and ancillary relief set forth in the Remedial Order specifically in the following areas:
A) Testing and Tracking (particularly ability grouping)
B) Counselling and Career guidance
C) A comprehensive plan for magnet schools and programs
D) An affirmative reading skills program
E) Cooperation with universities, business, and cultural institutions
F) Staff development and student training in human relations

2. Whether the local defendants having represented to the Court in hearings that they possessed a student transportation system appropriate for implementation of Phase II desegregation, failed to transport students effectively to Phase II schools on and after March 17, 1980.

3. Whether the local defendants, having represented to the Court that Phase II would be implemented on March 18, 1980, without Court approval or notice to the parties, unilaterally deferred implementation to March 19, 1980.

4. Whether the local defendants disobeyed the Court's Order of December 21, 1977, by placing administrative control over student transportation services under the Business Manager of the School District for a period of time that encompassed Phase I implementation as well as the start of Phase II implementation.

5. Whether the local defendants filed a timely and complete response to the Court's Order of February 15, 1980 requiring the defendants to respond to the Special Master's Report by February 25, 1980.

6. Whether the local defendants intentionally misled the Court in stating on December 18, 1979 that "no formal responses are made to the OSMCR reports and therefore there are no written responses to the OSMCR reports" when in fact such responses did exist.

7. Whether the local defendants implemented an effective and timely school–community relations program prior to Phase I implementation for the purpose of "involving a well informed community in the process of desegregation."

8. Whether the local defendants, having requested and obtained court approval to close Kennard and Rawlings Junior High Schools in the fall of 1979 and to assign students from those schools to other schools failed to assign students residing in Residential Zone 7027 to Gallagher Junior High School as set forth in the Remedial Order of February 6, 1978, and instead temporarily assigned these students to other schools in violation of the remedial order, thereby necessitating a second reassignment of the same students in the spring of 1980.

9. Whether the local defendants have failed to follow the Court's Order of September 30, 1977

had been subjects of an investigation conducted by the Department of Justice. That

requiring them to develop and submit to the Court a school closure study and school closing priority list, and instead have produced over time only a series of multiple school closing lists.

10. Whether the reassignment of certain students from Addison Junior High School was made on a segregated basis in violation of the Court Order of February 23, 1979.

11. Whether the local defendants, without requesting or obtaining court approval, have made changes and alterations in the Status Report Form adopted by the Court on July 30, 1979 in violation of an Order issued by the Court on September 4, 1979.

12. Whether the local defendants have printed and distributed a "Code of Student Rights, Responsibilities and Discipline" different in content from the Code submitted by the defendants and approved by the Court on February 23, 1979.

13. Whether the reporting relationship established by the Court Order of February 8, 1978 requiring "the head of the Division of Safety and Security (Wayne Howard) to report and be responsible directly to the Deputy Superintendent of Desegregation Implementation (Dr. Margaret Fleming)" was interfered with and the division head's authority usurped.

14. Whether the local defendants violated the procedures set forth in the Court Order of December 21, 1977 in processing a request from the Office on School Monitoring and Community Relations submitted on February 23, 1979 for additional funds from Cleveland's Emergency School Aid Act Special Projects Grant, and whether the authority and responsibility for soliciting such funds was usurped from the Deputy Superintendent of Desegregation Implementation (Dr. Margaret Fleming) by the Superintendent of Cleveland Public School System (Mr. Peter P. Carlin).

15. Whether the local defendants have provided "all fiscal and management structures that are essential to the effective provision and disbursement of funds necessary for the effective implementation of the Remedial Order of February 6, 1978 and the Amendment of June 16, 1978," and whether they have corrected numerous management deficiencies, including preparation and use of manning charts, programmatic budgeting, five–year budget projections, computerized inventory and inventory control, comparative financial statements, and budgeting by exception.

16. Whether the local defendants have implemented the remedial plan "in a manner that recognizes and supports" the school cluster organizations set forth in the plan, have undertaken administrative restructuring essential to permit effective administration of the clusters, have planned for and conducted staff develop-

investigation, undertaken pursuant to an order of this Court, found that probable cause existed in four areas to believe that the Cleveland defendants and their employees were in criminal contempt for failing to comply with orders of the Court. Report of the United States Pursuant to the Court's Order of April 2, 1979 Concerning Criminal and Civil Contempt, filed November 14, 1979.

At the April 1 hearings on the Special Master's Report of January 31, 1980, the local defendants requested that the separate hearings on civil contempt and the Special Master's Report be consolidated. Accordingly, the hearings were consolidated and beginning on April 7 and continuing until May 23, 1980 the Court received testimony from twenty–two witnesses, nineteen of whom are or have been members of the Cleveland Board of Education, top administrators of the school system responsible for desegregation implementation or employees of the system.

## I.

### A.

A review and evaluation of the evidence presented during the hearings on civil contempt and the Special Master's Report of January 31, 1980 cannot be undertaken without reference to the entirety of the record that has been developed in this case. For the past eight years, this Court has been continually and intimately involved in assessing the conduct of the Cleveland defendants. Additionally, the Court has had numerous opportunities during the trial and other hearings to evaluate the credibility of the defendants.

During this time, liability has been established, *see Reed v. Rhodes*, 422 F.Supp. 708 (N.D.Ohio 1976), *aff'd* 607 F.2d 714 (6th Cir. 1979), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980) and a Remedial Order designed to eliminate the effects of intentional segregative conduct has been issued. *See Reed v. Rhodes*, 455 F.Supp. 569 (N.D.Ohio 1978), *aff'd*, 607 F.2d 714 (6th Cir. 1979), *cert. denied* 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980). The record that has been amassed in this ongoing litigation is truly staggering. It consists of over 1300 docket entries, countless thousands of pages of court proceedings and hearings before the Special Master, hundreds of transcripts of meetings of the Cleveland Board of Education, hundreds of motions and briefs, numerous reports and memoranda of the Special Master, and voluminous reports from the Office on School Monitoring and Community Relations ("OSMCR"), and from the Cleveland Board of Education on the status of desegregation preparedness and implementation. District Courts are uniquely situated to consider the "very difficult and subtle factual questions" which arise during the course of school desegregation controversies and "to appraise the societal forces at work in the communities where they sit." *Columbus Board of Education v. Penick*, 443 U.S. 449, 470–471, 99 S.Ct. 2941, 2983, 61 L.Ed.2d 666 (1979) (Stewart, J., concurring). A careful review of the record in this case, combined with an awareness of the history of this litigation, provide deep insights into the ability and willingness of the Cleveland Board of Education, the Superintendent, and the Deputy Superintendent for Desegregation Implementation to comply with orders of this Court designed to remedy past discriminatory conduct.

ment sessions, community relations programs, student training and educational programming "in a manner that recognizes and supports these school cluster organizations."
17. Whether the local defendants effectively planned and timely prepared for implementation of a desegregation remedy pursuant to numerous court orders during the period from August 31, 1976 to the start of implementation of Phase I on September 10, 1979.

18. Whether the local defendants have jeopardized or continue to jeopardize in any way federal or state funding available to the school district or failed to conserve district assets which could further delay, interrupt or hinder implementation of the remedial order.
19. Whether the local defendants have maintained, perpetuated and furthered discriminatory physical conditions in schools within the system in violation of the Court Order of August 31, 1976.

## B.

It has been 2½ years since this Court issued a Remedial Order designed to accomplish two major objectives: the reassignment of pupils to fully integrated schools and classrooms, and the establishment of educational programs and other ancillary relief that will correct the effects of prior segregated schooling to the greatest extent possible. During this time, the Cleveland defendants repeatedly have represented to this Court that they are willing to cooperate in bringing about court–ordered desegregation and are taking all of the necessary steps to accomplish this objective. Recognizing that they are legally responsible for ensuring compliance with Court orders, the defendants claim that they "have endeavored to implement the Remedial Order–and other court mandates–with a spirit of willingness and enthusiasm." Supplemental Response to January 31, 1980 Special Master's Report, filed March 7, 1980.

These expressions of commitment to compliance with Court orders have been made by Superintendent Peter Carlin (Transcript of Hearings on Civil Contempt and the Special Master's Report of January 31, 1980, 4747, 4771 (Tr. 4747, 4771)). Deputy Superintendent for Desegregation Implementation Margaret Fleming (Tr. 3803, 3886), and the leadership of the Cleveland Board of Education. For example, Board President John Gallagher has stated publicly that one of his major goals is "to facilitate the implementation of a court order to desegregate in a manner that would be educationally sound and yet peaceful and orderly." This statement according to Mr. Gallagher, is "unequivocally . . . more consistent with most of the views" he has expressed on the matter of desegregation implementation. (Tr. 4536). Mr. Gallagher alluded to a resolution (Tr. 4537) and a speech (Tr. 4538) to indicate his constant support for safe, secure, and efficient desegregation. However, public statements urging the community to remain peaceful cannot be equated with a commitment or willingness to diligently pursue a desegregation remedy. Obviously the safety of students and the elimination of racial violence is of great importance. But safety can never be the sole goal of desegregation. The Court remains firmly committed to the concept of equal educational opportunity as embodied in the Remedial Order.

The representations made to this Court concerning the "commitment" to comply with court orders cannot be considered at face value. Public statements outside the limited confines of the courtroom, and ultimately actions undertaken, are important indicia. They reflect, perhaps more accurately, the underlying attitudes which motivate conduct. The public statements of elected school officials in leadership roles are important indicators of the existence of a willingness and readiness to achieve desegregation. Those who exert strong influences on the community through the public forum and their official positions can contribute greatly to the success or failure of the desegregation effort. United States Commission on Civil Rights, *Fulfilling the Letter and Spirit of the Law: Desegregation in the Nation's Public Schools (1976).*

Despite the representations made to the Court, the public statements of the leadership of the Cleveland Board of Education do not reflect a commitment to comply with court orders. This is apparent in the public statements of various members of the Board of Education. Illustrative are the public statements of Board President John Gallagher which, as he is well aware, have an impact on the community. (Tr. 4441) For the past two years that Mr. Gallagher has been President of the Cleveland Board of Education, he has consistently attacked the legitimacy of the Court and its Remedial Order in the media and at public meetings. For example, the reason given why the Board has been unable to strengthen the educational process "is simply because we have been so battered down by dealings with the Federal Court." (Tr. 4442–43, The Plain Dealer, September 26, 1978). Similarly, while noting his responsibility to "facilitate whatever the Court orders," Mr. Gallagher stated, "As you know from my voting record, I'm opposed to forced busing to integrate schools." (Tr. 4444, The Cleve-

land Press October 25, 1978). This aversion to court–ordered desegregation has been expressed publicly on numerous occasions. Shortly after implementation was ordered for fall of 1979 when an anxious and concerned community awaited the start of school the President of the Board stated: "We were disappointed by the defeat of [the Mottl Amendment which would ban court–ordered busing]. There is a significant possibility that it will be approved in some form in the near future." (Tr. 4358, The Plain Dealer, July 25, 1979). Perhaps the most inflammatory attack on the Court was the statement that the Federal Court "is not as concerned as the members of this Board and administration [with the safety of the students]." Transcript of August 9, 1979 meeting of Cleveland Board of Education 17.

The public expressions of "commitment" to desegregation have not been limited to direct attacks on the legitimacy of the Court and the constitutional remedy. The Office on School Monitoring and Community Relations ("OSMCR") funded by the federal government and established by the Court to perform an essential monitoring function, was described as having "carte blanche approval to expend taxpayers' dollars."[3] Transcript of February 8, 1979 meeting of Cleveland Board of Education, 234–36. Additionally, publicly expressed views of the certainty of "white flight," (Tr. 4358–59, The Plain Dealer, July 25, 1979) combined with the refusal to take appropriate preventive steps (Tr. 4577), can in no way be considered as evidence of a commitment to court ordered desegregation.

The various public statements of persons in leadership capacities catalogued above do not represent either the scope or breadth of the challenges that have been made to the legitimacy of this Court and its orders. They are but a partial reflection of an attitude that does not approach a real commitment to comply with Court orders. The statements are indicative of a hostility and recalcitrance which has been deeply rooted among the leadership of the Board ever since the commencement of this litigation.

The claim that the totality of public pronouncements over the years reflect a commitment to both the letter and spirit of this Court's orders is not supportable. In the first place, the record in no way substantiates this position. Instead, the record shows a continuing strategy of creating a public appearance of conflict with the Court, a strategy which is designed for blatantly political ends. However, even if it were true that only a minority of public statements reflect an attitude of non–compliance, a party cannot agree to follow court orders on some occasions and yet deeply attack the Court when it is politically expedient to do so. A few carefully timed and worded statements can serve to inflame or mislead the community and thereby impede a remedy designed to vindicate essential Constitutional rights.

This Court, over the years, has had an opportunity to observe and assess the conduct and testimony of the Cleveland defendants. Regrettably, the Court cannot find that the Cleveland defendants are genuinely committed to carrying out the letter and spirit of court orders relating to desegregation. This conclusion is not based merely on the public expressions of the leadership of the Cleveland Board of Education. It finds much more decisive and complete support in the actions of the Cleveland defendants over the past four years. These actions are highly probative of the posture of the defendants regarding compliance with orders of the Court.

---

**3.** The charge that the Office of School Monitoring and Community Relations ("OSMCR") has a "carte blanche" to expend taxpayers' funds is without factual foundation. OSMCR, a federally funded office has operated from its inception under line item budgets approved by the Department of Health, Education, and Welfare. The books and records of OSMCR are audited by a certified public accounting firm, and are kept in accordance with generally accepted accounting principles. Report of Coopers & Lybrand, dated August 2, 1979, filed (by the Special Master) on October 5, 1979. In sharp contrast to the handling and accounting of other Cleveland Public School funds, only OSMCR funds are "subject to such strict and proper accountability principles." Special Master's Report of January 31, 1980, 33.

In instances too numerous to comprehensively detail, the Cleveland defendants have undertaken to frustrate the efficient and orderly implementation of Court orders. The examples which follow are illustrative, not exhaustive. They reveal a system structured and staffed in such a manner that compliance is not attainable and which lacks the decisive affirmative leadership critical to efficient, safe, and educationally—sound implementation of the desegregation orders.

1. *Promulgation and Implementation of a Remedial Plan*

The conduct of the Cleveland defendants in the promulgation and implementation of the Remedial Order illustrates a pattern of procrastination and delay which has served consistently to impede the timely implementation of an effective remedy. This pattern began shortly after liability was established and the Cleveland defendants were ordered to submit a proposed remedial plan by January 18, 1977. Their first plan was rejected by the Court because it "in no way could be interpreted to be in compliance with the Court's Guidelines and Instructions, nor did it even purport to address the scope and extent of the violations found by the Court." *Reed v. Rhodes*, 455 F.Supp. 569, 605 (N.D.Ohio), *aff'd*, 607 F.2d 714 (6th Cir. 1979), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980). The defendants' second proposed plan, together with two amendments thereto, also was found to be unacceptable, since it was "educationally unwise, irresponsible, and administratively and fiscally unsound." *Id.* The defendants did not file their final proposed remedial plan until May 13, 1977, "almost four months after the original due date for the submission of a workable plan." *Id.* Even then, there were serious deficiencies in the plan submitted.[4] *See* Special Master's Recommendations Regarding Defendants' Proposed Desegregation Plans, filed October 27, 1977.

The Cleveland defendants were first ordered to desegregate the school district by Fall 1977, Order of December 7, 1976, 2, but desegregation was deferred to Fall, 1978 due to the defendants late submission of a proposed plan and low level of preparedness.[5] *See* Special Master's Report on Proceedings of May 27, 1977; Order of August 15, 1978, 2. Again in August, 1978, the Court was forced to defer implementation due to the defendants' "deplorable lack of preparedness" which "was not inevitable but was a result of the procrastination of defendants and of their failure to adopt, *inter alia*, suggested long term financial planning to assure full implementation of desegregation per Court order." Order of August 25, 1978, 1–3; *see also* Order of August 15, 1978.

In numerous other instances the process of implementing the desegregation remedy has been delayed due to action of the Cleveland defendants. For example in August, 1978, the Cleveland defendants submitted a limited desegregation and school closing plan. *See* Cleveland Defendants' submission of August 17, 1978. After a hearing, this Court was forced to reject the plan "because it fails to comport with this Court's August 15, 1978 and February 6, 1978 Orders and because it would severely impair the future of rational and peaceful desegregation." Order of August 25, 1978, 7. Similarly, in September, 1978, the Cleveland defendants were ordered to implement their own proposed plan for school closings

---

4. The Special Master's remedial plan submission formulated with the assistance of two Court-appointed experts, was developed after extensive public hearings conducted during the summer of 1977, input from individuals with desegregation experiences in other cities, and personal visits to cities undergoing school desegregation. This submission unlike those of the local and state defendants, provided the framework for a comprehensive remedial plan and was far more responsive to the need to remedy the Constitutional violations.

5. The September 30, 1977 findings of the Special Master, which were adopted by the Court, substantiated the low level of preparedness for desegregation implementation and further revealed serious operational and financial deficiencies in the Cleveland Public School system. *See* Special Master's Report of September 30, 1977.

and student reassignments, based on their assurances of their "financial and administrative wherewithal." Order of September 8, 1978. However, hearings revealed that "the school administration had failed, in all respects, to begin preparing" for implementation of said plan. Order of October 16, 1978. *See also* Hearings of October 10 and 11, 1978; and OSMCR Report of September 22, 1978.

It was not until November, 1978, that the Cleveland defendants finally proposed an acceptable, though partial, implementation schedule for junior high schools. *See* Order of November 10, 1978. However, after this proposed implementation had been approved by the Court, the defendants sought and received a stay from the Court of Appeals for the Sixth Circuit which again delayed implementation. *Reed v. Rhodes*, Nos. 78–3156, 78–3405, 78–3406 (6th Cir. January 8, 1979). Finally, in July, 1979, after the decisions in *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979) and *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979), and after the failure to implement even limited desegregation or to submit acceptable school closing plans for the 1978–79 school year, the Court adopted an implementation schedule consisting of three phases. This implementation schedule was necessitated because of the Cleveland defendants continuing limitations, especially in the areas of finance and student transportation. *See* Order of July 30, 1979; Special Master's Report of July 13, 1979.

The pattern of delay and procrastination documented in the record is a far cry from the repeated assertions of obedience to the Court's orders. The "marked lack of enthusiasm for desegregation planning," *Reed v. Rhodes*, 455 F.Supp. at 605 evidenced by delays and inadequacies in submissions and rampant unpreparedness, has frustrated judicial decrees designed to remedy Constitutional violations.

### 2. Administration of Desegregation Planning and Implementation

Extensive hearings before the Special Master during the summer of 1977 documented the Cleveland defendants' lack of expertise and experience needed to undertake the planning and implementation of desegregation. *See* Special Master's Report of September 30, 1977. The Court's concerns about securing individuals with the requisite expertise and experience were expressed on numerous occasions to the Cleveland defendants. However, because the defendants refused to secure the assistance of experts for purposes of fashioning and implementing a desegregation remedy, the Court reluctantly was forced to establish a Department of Desegregation Implementation. *Reed v. Rhodes*, 455 F.Supp. at 605; Order of December 21, 1977. The Cleveland Board of Education also declined to appoint a Deputy to run the new department, and with the exception of one member, also declined to submit names of candidates for the position. *Reed v. Rhodes*, 455 F.Supp. at 606. Subsequently, Dr. Charles Leftwich was appointed as Deputy Superintendent for Desegregation Implementation. Order of March 7, 1978. Dr. Leftwich, who had extensive experience and expertise in system–wide desegregation planning and implementation [6], received little support and was generally stymied by a hostile Board of Education and an uncooperative administration. He was labelled an adversary by Superintendent Carlin. Transcript of October 10, 1978 Hearings, 51. His expenditures in the performance of his tasks were subjected to intense and undue scrutiny. During the period Dr. Leftwich was Deputy Superintendent for Desegregation Implementation, the Board of Education rejected contract and consulting requests of

---

**6.** Dr. Leftwich had previously been employed as Associate Superintendent in the Boston Public School system with responsibility for implementing the Federal District Court's desegregation order. He had extensive consulting experience in desegregation–related matters. *See* Resume of Charles W. Leftwich, attached to Special Master's Recommendations of a Deputy Superintendent for Desegregation Implementation in the Cleveland Public Schools, filed March 6, 1978.

only one department, the Department of Desegregation Implementation headed by Dr. Leftwich. *See* Order of October 27, 1978.

The Cleveland Board of Education also failed to provide qualified personnel to assist Dr. Leftwich in carrying out his court ordered duties. Therefore "to assure that desegregation planning goes forward with all due speed" *see* Recommendations of Special Master, filed April 21, 1978, this Court was required to order the Board of Education to hire seven assistants. Order of April 21, 1978.

The uncooperative atmosphere fostered by the Cleveland defendants eventually forced Dr. Leftwich to request this Court to relieve him of his position in October 1978. With the loss of Dr. Leftwich, the Cleveland school system lost the services of a highly competent, dedicated, and experienced desegregation administrator. With the resignation of Dr. Leftwich the Court established procedures to be followed in the appointment of a new Deputy Superintendent. *See* Order of October 27, 1978. This Court attempted to assist the Board in selecting an able Deputy Superintendent of Desegregation Implementation and spent many hours interviewing candidates. These efforts, however were spurned by Superintendent Carlin and the Board of Education when they nominated Dr. Margaret Fleming, an administrator without any experience whatsoever in desegregation related matters.[7]

There is no doubt that the Cleveland School Board and Superintendent Carlin believed Dr. Fleming's nomination would be rejected when it was submitted to the Court for approval, according to the testimony of Mr. Gallagher. (Tr. 4522). The defendants were well aware that the Court was firmly convinced that "experience in or related to desegregation implementation" was a highly relevant and important criterion for selection of a Deputy Superintendent. *See* Special Master's Recommendation of a Deputy Superintendent, filed March 6, 1978.

However in the face of strong doubts, the Court did not reject Dr. Fleming's nomination. Instead, the provision of the Order of October 27, 1978 which required this Court to approve the defendant's selection of a new Deputy Superintendent was vacated. The Court in no way wished to be seen as "approving" an administrator it felt was not capable of effectively implementing system–wide desegregation. However, the Court also had no interest in tarnishing the reputation of Dr. Fleming by rejecting her nomination, or in delaying further implementation of the remedy. She was appointed with no objection by either the plaintiffs or the government.

At the time of Dr. Fleming's appointment as Deputy Superintendent, the Court noted that it would be best for the school system and best for the children if someone were appointed who had expertise and years of experience in desegregation. "However, it is defendants' responsibility to judge their needs for outside expertise in desegregation. Should implementation stumble or falter for lack of expertise defendants will be held to answer to this Court." Order of December 15, 1978, 5.

The failure to accord any weight to the expertise and experience of key personnel or to suggestions of the Court did not end with Dr. Fleming's appointment. The staffing of the operational divisions within the Department of Desegregation Implementation following Dr. Fleming's appointment demonstrates the continued failure of the Cleveland defendants to make personnel decisions designed to achieve substantial compliance with court orders.

---

**7.** Dr. Fleming has been an employee of the Cleveland Public School system since 1957. She was the Director of Research and Development from 1974 until her appointment as Deputy Superintendent of Desegregation Implementation, and had been an employee in that Division since 1967. Dr. Fleming had *no* desegregation experience prior to her appointment as Deputy Superintendent for Desegregation Implementation. *See* Curriculum Vita of Margaret M. Fleming, attached to the Cleveland Defendants *In Camera* Response Regarding Appointment of Deputy Superintendent and Assistant to the Deputy Superintendent, filed November 20, 1978.

In both the planning and implementation of Phases I and II, responsibilities in the most critical areas were delegated to persons without relevant desegregation experience or expertise (i. e. transportation, community relations, guidance and career counselling, collaborative programs with educational, business, and cultural institutions, testing and ability groupings, and staff/student development and human relations training). Members of the Board were aware that their key managers did not have desegregation experience (Tr. 4300). They did not however reject any key departmental personnel decisions made by Superintendent Carlin and Deputy Superintendent Fleming (Tr. 4299). Worse still, they acquiesced in the hiring of critical supervisory personnel in transportation and community relations areas who had practically no relevant experience for the job to be filled.

The Cleveland defendants conduct in establishing and staffing the Department of Desegregation Implementation does not reflect an underlying commitment to achieve compliance with the Remedial Order. In numerous instances, the defendants have chosen confrontation over compliance. They also have refused to make decisions essential to achieving successful desegregation implementation.

3. *Provision of Information on Desegregation Planning and Implementation Status Reports*

The Court repeatedly has reminded the Cleveland defendants of the self evident need for careful, systematic preparations for effective implementation of the Remedial Order. This requirement was incorporated in the "Basic Guidelines for Planning for the Implementation of the Remedial Orders" adopted by the Court in July, 1979. *See* Special Master's Report of July 13,

1979, 2, guideline 5; Order of July 13 1979, adopting said Guidelines. This requirement was incorporated in the Guidelines because the Special Master had found that "defendants' planning has been a recurring problem," and the Court had repeatedly found that the Cleveland defendants' preparations for Remedial Order implementation were deficient. *See also* OSMCR Reports of September 22, 1978, December 18, 1978, March 16, 1979, June 1979. For example, prior to adoption of the Basic Guidelines by the Court, the Cleveland defendants submitted a number of "progress reports" pursuant to court orders. These "progress reports" related to then–scheduled implementation of a limited desegregation plan in early 1979. OSMCR monitored these reports, and reported a number of serious flaws in the defendants' reports, including the defendants' tendency to miss their own task completion deadlines. OSMCR Report of December 18, 1979; *see also* Special Master's Report of July 30, 1979, 2.

Because the defendants failed to provide a comprehensive planning framework, this Court adopted the status report form recommended by the Special Master.[8] Order of July 30, 1979, adopting the Recommendations of the Special Master on Status Reports, filed same date. In order to achieve careful, systematic preparations for effective implementation of the Remedial Order the Cleveland defendants were required to submit status reports which "set forth the schedule of activities and tasks essential to effective implementation of the Remedial Order." Special Master's Report of July 13, 1979, guideline 10. The status report forms were to be completed in accordance with a set of instructions and a schedule established in the Order of July 30, 1979.

**8.** The Status Reports consist of 19 sections (A through S). Each section identifies a major area of desegregation planning (e. g., transportation, safety and security, community relations, etc.) and each area is broken down into a series of numbered tasks and subtasks. The Defendants were instructed to fill in planned completion dates for each task or subtask, the actual completion date, and the date evidence was submitted to the Court of completion of each task. The status reports, by virtue of their detail in identifying the tasks vital to effective desegregation and the grouping of tasks in logical sets, provided the defendants with a comprehensive framework which they lacked. The status reports were designed to tighten reporting procedures. *See* Special Master's Report of July 30, 1979.

The Cleveland defendants were advised that the "Status Reports represent the minimum tasks on which Defendants are to report" and therefore defendants were instructed to feel "free to expand the Status Reports to include additional tasks." Recommendations of the Special Master on Status Reports, filed July 30, 1979, 8. No planned completion date was to be changed by the defendants without prior permission from the Court. *Id.* at 7. The defendants were responsible for the accuracy of all matters contained in the reports. *Id.*

Notwithstanding the specific language of the adopted recommendations, the Cleveland defendants made unilateral alterations in the language of the task descriptions of the Court–adopted status report forms without court approval.[9] In addition the defendants emasculated the significance and utility of the "Planned Completion Dates" portion of the status reports, which was intended to impose a rigid schedule leading to systematic implementation. This was accomplished by changing the dates without permission of the Court, *see, e. g.* Tasks D3.25, D3.31, and D5.00 in community relations section; *see generally* Phase I Status Report of August 6 and subsequent Status Reports filed by the defendants for Phases I and II, or by entering the phrases "and ongoing" or "continuous between [two specified dates]" thereby specifying no specific date by which the tasks could be expected to be completed. *See* Sections C, D, E, G, H, I, O, P, and Q of Status Reports for Phases I and II.

The changes made by the defendants do not represent mere technical alterations designed to improve the exchange of information. In many instances the changes are substantive and serve to modify the obliga-

tions imposed by the Court. For example, the Court–approved status report requires the defendants to enter a planned completion date for an *activity.* This requirement has been changed to the entering of a planned completion date for a *plan. See, e. g.*, Phase I Status Reports, Sections C, D, E, G, M. Similarly, the Cleveland defendants have altered the type of evidence of task completion which is required to be submitted to the Court. *See* Report and Recommendations of the Special Master, filed August 31, 1979.

The alterations in the status reports have significantly reduced their value both to the Cleveland defendants and to the Court. Important information is not provided, and the benefits of structured, programmatic planning are lost.

### 4. Inaccuracies and Misrepresentations in Submissions to the Court

On numerous occasions during this litigation, the Cleveland defendants have supplied the Court with information which is inaccurate or misleading in status reports, direct testimony, and other submissions. The inability of the Court to rely on the defendants' representations is perhaps the most serious obstacle confronting the Court in its effort to ensure that remedial orders are obeyed.

Testimony received during the hearings on civil contempt and the Special Master's Report of January 31, 1980 demonstrates that important information submitted to the Court in status reports was inaccurate or misleading. The Court was led to believe that specified tasks were being performed in a timely and effective fashion, a belief certainly at variance with the testimony. For example, with regard to stu-

---

9. Three examples suffice to demonstrate the substantive nature of changes made in the Status Report forms by the defendants. Task D3.30 in the Court–adopted Status Report is: "Subplan for a media campaign to demonstrate commitment of school officials to implement the Remedial Order . . ." Defendants altered the task to read: "Media campaign to disseminate information to the public relative to implementation of the Remedial Order." *See* August 13, 1979 Phase I Status Report. Task 3.00 in

each section of the Status Report required ". . . the development of written plans by the Deputy Superintendent for Desegregation." The task was altered in each section to eliminate any reference to the Deputy Superintendent for Desegregation Implementation. Finally, task descriptions were altered which affected the nature and content of both student information and staff training for Phases I and II. *See* Task E3.10 and Q3.10 in the August 6 and subsequent Status Reports filed by defendants.

dent training, the Cleveland defendants and their employees wrote that, "By (October 18, 1979) *every school* in Phase I had received services." Responses to Comments of OSMCR Regarding Implementation of Educational Components of the Remedial Order Department of Desegregation Implementation, February 25, 1980, 33. In fact, according to Mr. John Ryan, head of student training, at least 30% of Phase I students had received *no* basic information by January, 1980. Similarly, Task Q3.10 of the Status Report, relating to the development of a "subplan for a comprehensive pre–implementation course of in–service training" for staff, contained a planned completion date prior to Phase I. This completion date was solely of academic interest since the activities specified under the sub–plan were not carried out prior to Phase I.

Another example of inaccurate statements being supplied to the Court occurred prior to Phase I implementation, when the Cleveland defendants assured the Court that, "Virtually all 58 essential pre–implementation tasks (Phase I) have been completed" or "will be finished before student movement is scheduled to commence on September 10, 1979." Response of the Cleveland Board of Education to Order of August 31, 1979, filed September 4, 1979, 1. However, the evidence elicited during the hearings on civil contempt and the Special Master's Report of January 31, 1980 revealed this not to be the case. *See* pp. 379 396 *infra*; Special Master's Report of January 31, 1980. In all areas–transportation, community relations, educational components and other ancillary relief–there were serious shortcomings in implementation due to actual failures to complete the pre–implementation tasks either at all or in a timely fashion. Inaccurate or misleading assurances also have been supplied to the Court in the areas of school closings and magnet schools. For example, when the defendants sought to close Kennard and Rawlings Junior High Schools, the Court was assured that the reassignment of students would occur pursuant to the Remedial Order. Motion to Reconsider, August 2, 1979. However, in spite of this assurance,

one hundred thirty students were reassigned first to Herrick Junior High School in the Fall of 1979, where due to overcrowding, they were placed in an Annex three miles from the school. *See* OSMCR Report of November 21, 1979; Special Master's Report of January 31, 1980, 14. A second reassignment of these same students took place in March of 1980 when they were transferred to Joseph Gallagher Junior High School. With regard to magnet schools, the Court was advised that:

The Cleveland School System, as documented in the Court–mandated status report, Section F, is committed to the generation of a master plan for magnet school development. The Magnet School Planning Committee's time line for the generation of this master plan projected January 30, 1980, as the date when the approved master plan would be ready for submission to the Federal Court.

Responses to Comments of OSMCR Regarding Implementation of Educational Components of the Remedial Order, February 25, 1980. In fact, the projected date was changed to March 15, 1980, and even then the "Master Plan" did not include magnet proposals beyond 1980; lacked a complete proposed curriculum for the Fall, 1980 magnet schools and was not coordinated with a school closing plan. Cleveland Public Schools Master Plan for Magnet Schools filed March 17, 1980.

There are numerous other instances of inaccuracies and misrepresentations contained in pleadings submitted to the Court or in testimony. Perhaps most egregious are the representations regarding transportation made to the Court immediately prior to the start of Phase II during hearings held during the week of March 11–14, 1980. The purpose of these hearings was to assess the preparedness of the Cleveland defendants for Phase II desegregation, a purpose rendered more urgent by the Special Master's Report of January 31, 1980, which found serious shortcomings in the defendants level of preparedness.

During these hearings, the defendants and their employees consistently and uni-

formly represented to the Court that they were prepared to transport students reassigned for Phase II. George Mazzaro, the Business Manager of the Cleveland public school system, assured the Court that, in his professional opinion "the Board (is) prepared to transport the children participating in Phase II in a safe and efficient manner." Transcript of March 11, 1980 Proceedings, 69–70. Dr. Margaret Fleming, the Deputy Superintendent of Desegregation Implementation, while expressing some minor reservations, testified that "there is a great likelihood that Phase II will be implemented in a safe, efficient, and educationally sound manner." *Id.* at 179. Superintendent Peter Carlin also concurred, stating that the school system would be ready to implement Phase II on March 17, 1980. *Id.* at 537. The State defendants also joined in this assessment. "It is the considered judgment of the State defendants that the Cleveland defendants will be in a position to satisfactorily implement Phase II of the desegregation plan beginning on March 17, 1980. Cleveland's state of readiness is far superior to that for Phase I. It is not anticipated that major problems will be encountered." Memorandum of State Board of Education and Superintendent of Public Instruction Re Phase II Readiness, filed February 25, 1980.

The evidence presented during the hearings on civil contempt establish conclusively that these representations were false. Both the Cleveland and State defendants were acutely aware of major deficiencies in the transportation area. However, instead of accurately depicting the level of readiness, they chose to mislead the Court and the public. *See* pp. 380–385 *infra.*

These not infrequent discrepancies between fact and the representations of the Cleveland defendants and their employees raise serious questions about the reliability of the defendants' submissions and testimony.

By delaying the promulgation and implementation of a remedial plan, improperly staffing the Department of Desegregation Implementation, altering and providing inaccurate responses in status reports, and supplying inaccurate or misleading information on numerous occasions, the Cleveland defendants have impeded the orderly, efficient, and educationally sound implementation of Court orders. Of course, these areas do not exhaust the instances in which Court orders were ignored or violated. For example, the Department of Justice found that in four of five instances investigated, there is probable cause to believe that the defendants or their employees have committed criminal contempt. Report of the United States Pursuant to the Court's Order of April 2, 1979 Concerning Criminal and Civil Contempt ("Report of the United States on Criminal and Civil Contempt"). First, in violation of court orders, black students assigned to Westropp Junior High School were placed in segregated classes for several weeks. Report of the United States on Criminal and Civil Contempt, 77–78; OSMCR Report of March 16, 1979; Special Master's Report of January 31, 1980, 14. Second, the Cleveland Board of Education failed to submit a Code of Student Rights and Responsibilities on the date specified by the Court, and subsequently submitted an "incomplete" code. Report of the United States on Criminal and Civil Contempt, 33–34; Special Master's Report of January 31, 1980, 20–22. Third, the reporting relationship between the division head of the Department of Safety and Security was structured in a manner clearly in violation of Court orders. Report of the United States on Criminal and Civil Contempt, 51–52; Special Master's Report of January 31, 1980, 28; Letter from Business Manager Mazzaro to Wayne Howard, January 29, 1979. Finally, in contravention of a Court order, the responsibilities for identifying, soliciting, and administering federal financial resources were not assumed by the Deputy Superintendent for Desegregation Implementation, and a budget request for additional federal funds for OSMCR was not timely processed by Superintendent Carlin. Report of the United States on Criminal and Civil Contempt of November 14, 1979, 67–77; Special Master's Report of January 31, 1980, 35.

The enormous record developed to date reveals a pattern of resistance, hostility and confrontation clearly contradicting the Cleveland defendants' assertions of commitment to the letter and spirit of judicial decrees.

### C.

The form of resistance encountered in this case generally is not characterized by outright defiance of Court orders; nor is it discernable by focusing exclusively on public expressions of the defendants. Rather it is much subtler and involves the widespread failure to undertake those actions which will permit or facilitate desegregation. Thus while the Cleveland defendants continually reiterate their "commitment," they knowingly refuse to provide either the organizational structure or the administrative personnel necessary to carry out the Remedial Order. The result is systemic maladministration, a form of resistance quite different from "standing in the schoolhouse door," but equally effective in impeding desegregation.

Since 1976, when liability first was established, the Court has been extremely concerned about the capacity of the Cleveland school system to plan and implement a system-wide remedy that provided not only for student reassignment but also for the establishment of remedial educational programs and other ancillary relief. This concern was evident in the Remand Opinion of February 6, 1978, which stated:

> Developments since liability of the defendants was established reveal that the picture of managerial competence, financial soundness, and quality education painted by the defendants was nothing more than sheer fantasy. ... The administrative procedures for determining and implementing educational policies are formless. To the extent they exhibit a design, it is one of lack of managerial skill in administration.

*Reed v. Rhodes*, 455 F.Supp. at 569.

Because of the serious structural and managerial problems which plagued the Cleveland public school system the Court was forced to balance two sometimes polar considerations. On one hand a need existed to implement a desegregation remedy quickly; on the other hand, a need existed to ensure that the remedy was implemented in an efficient, safe, and educationally-sound manner.

On a number of occasions the Court has received substantial evidence indicating that the Cleveland defendants were unprepared to successfully reassign students and to implement the remedial programs and ancillary relief in an educationally sound manner. *See* pp. 369–370 *supra*. On these occasions, the Court declined to order implementation because the evidence indicated no reasonable likelihood of success. However, the Cleveland defendants have been advised continually that it is their obligation to carry out the Remedial Order in a timely fashion.

The Court certainly is aware of the difficulty of desegregating a large urban school system that has intentionally and over a long period of time segregated pupils according to race. The sheer diversity of the areas involved (i. e. transportation, community relations, staff and student development, testing and tracking, guidance and career counselling, remedial educational programs, etc.) underscores the comprehensiveness of the remedy. To successfully implement the remedy, responsible and able administrators must provide decisive leadership in formulating elaborate and effective plans and in supervising implementation. And the organization itself must be structured in a manner that facilitates rather than impedes planning and implementation.

Since at least 1977 the Cleveland defendants have known that the school district is structured and staffed in a manner which impedes the efficient, safe and educationally-sound implementation of a desegregation remedy. The Court repeatedly has urged, cajoled and advised the defendants to correct these systemic deficiencies in order to be able to successfully desegregate the system. In addition to the Court, the Special Master and various other outside experts have conducted extensive studies of

the fiscal and managerial capabilities of the school district. These reports, detailing numerous deficiencies and outlining corrective recommendations have been delivered to the Cleveland defendants. Subsequent actions by the defendants indicate that they have either incompletely or in a piecemeal fashion considered the findings and adopted the recommendations. There has been a failure to implement reforms necessary to permit substantial compliance with the Remedial Order.

In June and July 1977, shortly after liability was established, the Special Master conducted extensive hearings on the proposed remedial plans. Special attention was focused on the ability of the district to plan and implement a system–wide remedy. In a report submitted on September 30, 1977, the Special Master found serious management and fiscal deficiencies which impeded the ability of the district to plan and implement in an effective manner. *See* Special Master's Report of September 30, 1977. For example, the Special Master noted that

> The Cleveland School District has made no long range pupil population projections, conducted no studies regarding efficient utilization of school buildings in the system, made no unified, long range, district wide school closing plans, and relied on incomplete, sketchy, non–cohesive studies in determining the schools to be proposed for closing.

*Id.* at 7.[10]

The Special Master also detailed important shortcomings in the financial organization of the district, which have contributed greatly to the present fiscal chaos.[11] *Id.* at 14, 15.

The Special Master was not the sole expert to discover important systemic deficiencies which prevented the system from "delivering" a system–wide remedy. Dr. Walter Garms prepared a report to the Study Group on Racial Isolation in the Public Schools. Dr. Garms' report detailed a series of organizational and structural weaknesses, including an extremely centralized administrative structure staffed with individual administrators not expert in their jobs, the lack of a management information system, unimaginative and improper computer usage, a general deficiency in planning capabilities, and a financial structure which precludes accurate projections of future costs and revenues. Analysis of the Special Master's Interim Report and Hearing Transcripts dated October 13, 1977.

The fiscal problems confronting the Cleveland Public Schools were the subject of study by Ernst & Ernst conducted pursuant to a Court–ordered review of the managerial and accounting systems of the district. The study confirmed many of the basic flaws in financial management and accounting which had been reported by the Special Master including the absence of a monthly cash flow plan of receipts and expenditures, managerial financial reports, an operationally meaningful budget, control over physical assets of the School District, and of an accounts payable system.

10. Up to the time the contempt hearings began, the Cleveland defendants still had not properly addressed this vital matter. A filing recently has been made regarding school closings, but the Court has not yet had the opportunity to determine the sufficiency of that document.

11. Some of the weaknesses developed in the hearings before the Special Master included the following:
  1. The Cleveland defendants have not prepared or utilized long–term projections and studies.
  2. They do not use modern accounting techniques such as:
    (a) Double -entry bookkeeping
    (b) Cash flow projections and analysis
    (c) Comparative financial reporting
    (d) Reporting by exception
    (e) Inventory control
    (f) Use of cost centers
    (g) Internal auditing
  3. They do not seem to undertake cost effectiveness nor cost benefit analysis.
  4. They have not . . . undertaken a program aimed at enhancing allocation of tax delinquencies or speeding up tax collections.
  5. The computer is not properly utilized as a management tool.
  6. Enrollment projection (sic), which is the cornerstone of school finances, are not made on a long–term basis . . .
  7. Idle cash appears only to be invested once or twice a month rather than daily.

Many of the Ernst & Ernst findings also were made by the Senate Education Committee in its June 12, 1978, Proposed Senate Education Committee Report: Cleveland City School District Fiscal Problem. The report again noted the lack of administrative ability in the financial management area. Indeed, numerous findings of critical deficiencies are strikingly similar to those contained in the Special Master's Report of September 30, 1977 issued nearly one year earlier.

It is obvious that a modern system of management and administration is required for a school district which controls over a half a billion dollars of assets, has a current annual cash flow in excess of 325 million dollars, currently employs over 10,000 full–time employees and 7,000 part–time employees, and if in the private sector would rank well up in the *Fortune* 500 list. However, as the Special Master correctly has found, continuing management shortcomings continue to plague the school district and prevent effective managerial control from being exerted. *See* Special Master's Report of January 31, 1980, 37–47; Special Master's Report of July 30, 1979.

The testimony presented during the hearings on civil contempt and the Special Master's Report of January 31, 1980 does not depict an administrative system which is operating efficiently. In operational units of the Department of Desegregation Implementation, duties and responsibilities of key personnel, lines of authority, interdepartmental relationships and the like are either non–existent or not clearly defined. Additionally, the Department of Desegregation Implementation is staffed in important operational areas with managers who can in no way be considered qualified for their positions. These systemic, organizational and managerial deficiencies have been important contributing factors in the failure of planning and implementation in Phases I and II. *See* pp. 379–395 *infra*. Testimony received by this Court and the reports by the Special Master and outside experts detailed with great specificity an entire range of problems which prevent the Cleveland School District from exerting effective managerial control. The structural limitation and managerial deficiencies are so serious that they have caused or contributed to grossly inadequate desegregation planning, *see, e. g.* Special Master's Report of July 30, 1979, and financial difficulties which are then seized upon by the Cleveland defendants to demonstrate the impossibility of compliance with the Remedial Order.

In the face of comprehensive recommendations designed to improve organizational structure and managerial capability, the Cleveland Board of Education and its highest administrative officials have chosen to continue operating the district without substantial change, with the predictable result that the district has not been and is not in a position to comply with the court–ordered desegregation and ensure that implementation is accomplished in an efficient, safe, and educationally–sound manner. The existence of the documented systemic, organizational and managerial deficiencies makes substantial compliance with orders of the Court exceedingly unlikely. In the face of knowledge of these obvious deficiencies which prevent substantial compliance, the conduct of the Cleveland Board of Education in failing to take steps to correct the situation constitutes at best gross negligence and at worst a purposeful, designed attempt to frustrate implementation of this Court's orders.

## II

The evidence presented during the hearings on civil contempt and the Special Master's Report of January 31, 1980 focused primarily on the performance of the Cleveland defendants in the areas of transportation, community relations, and educational components and other ancillary relief during Phases I and II. With partial implementation in the Fall of 1979 and a second stage in March 1980, the defendants have had two opportunities to demonstrate in an empirical manner their ability to administer a system–wide desegregation remedy. Regrettably, the record of accomplishment is dismal; it reflects primarily chaos, ineffici-

ency, and incompetence. With characteristic understatement, even the Cleveland defendants are forced to concede that "there were admittedly shortfalls in the desegregation implementation process." Response of the Cleveland Board of Education to the Proposed Order of the United States for the Appointment of a Desegregation Administrator, filed June 16, 1980, 2.

## A.

## Transportation

The first two weeks of Phase II desegregation were "disasters," according to Dr. Fleming. (Tr. 3836) The scope of the breakdown in transportation which accompanied Phase II implementation was awesome, not only in the number of pupils affected but also in the quantity of systemic failures. While the following description of what actually transpired is most difficult to believe, it reflects the actual preparedness of the Cleveland defendants for Phase II implementation.

On the eve of Phase II the Cleveland defendants hastily and unilaterally deferred implementation by one day notwithstanding the fact that the Court had approved the initial date. (Tr. 166, 3631). The reason for the delay was that there was not a sufficient number of buses available. (Tr. 421). Two factors contributed to this shortage: first, until the final days prior to Phase II, the Cleveland defendants actually did not know how many buses were required (Tr. 169, 281)[12]; second, many of the buses that were leased were either inoperable (Tr. 174), or not ready for operation. (Tr. 714–19).

Even with the delay, Phase II began with an insufficient number of buses. (Tr. 1007, 1018). Of the 233 buses required under Phase II, only 192 were operating on Friday, March 21, the fourth day of Phase II. (Tr. 3626). A large number of the buses which had been leased (approximately thirty of one hundred twenty–five) were inoperable (Tr. 738), and others suffered mechanical failures. (Tr. 711). The result was that on some days approximately 500 students were left on the streets waiting for buses which either never arrived or arrived two to three hours late. (Tr. 3628).[13] As Dr. Fleming described it, there were "late buses galore" and "missed routes." (Tr. 3628).

The lack of an adequate number of buses was not the only glaring failure of the transportation system. Grossly inadequate repair facilities (Tr. 3612) and an inadequate number of trained mechanics insured that broken–down buses would not be returned to service in a timely manner. (Tr. 1018, 1023, 1025). The absence of a preventive maintenance program (Tr. 276, 1032), contributed heavily to a situation where there was no mechanism for controlling foreseeable mechanical difficulties, with the consequence that breakdowns were highly disruptive.

The massive failure of the transportation system during Phase II desegregation implementation was the result of the appointment by the Cleveland defendants of an inexperienced, ineffective, and unqualified transportation administrative staff. (Tr. 1018). The administrators and leadership of the Cleveland Board of Education were aware that the transportation system was staffed by administrators and supervisors

12. Part of the confusion regarding the number of buses needed for Phase II arose because Mr. Mazzaro and Mr. Perry inaccurately believed that possibly a smaller number of buses would be needed at the start of implementation, since the implementation schedule provided that seventh grade students would be transported on day 1, eighth grade students on day 2, ninth grade students on day 3, and all three grades on day 4 (Tr. 283, 722). That this belief was held indicates the absence of even rudimentary knowledge regarding the design of bus routes.

They apparently were unaware that routes were designed geographically for all three grade levels and therefore that full routing would occur each day.

13. A complete description of the number of buses which failed to run routes, picked up pupils late, or arrived at junior high schools after the opening time is contained in Reports of the Office on School Monitoring and Community Relations filed March 17, 18, 19, 20, 21, 24, 31, 1980.

without experience in operating large transportation systems (Tr. 4149). They also knew that numerous problems in the transportation system had occurred during Phase I. (Tr. 4150). Even the State defendants were aware of the absence of "either the staff or the organizational structure necessary to operate a significant number of school buses." (Tr. 390).

The debacle of Phase II transportation is directly attributable to deficient planning and implementation by the Cleveland defendants. The entire Phase II pre–implementation period revealed the "absence of definitive decision making and direction." (Tr. 929). The causes of failure are rooted in the conduct of the defendants over the past few years. The conduct consists not only of deliberate and willful violation of remedial orders issued by this Court, but also of decisions which have consistently impeded rather than facilitated desegregation.

On December 21, 1977, the Court ordered that the Cleveland Board of Education establish a Department of Desegregation Implementation ("DDI") to be headed by a Deputy Superintendent for Desegregation Implementation. Among a number of operational units to be included in DDI was one for transportation planning and administration. Under the Order, "The duties of the Deputy Superintendent for Desegregation Implementation shall include, but not be limited to: Planning and administration of transportation as is required under the plan." Order of December 21, 1977, 3. The organization was ordered only after the Court "received substantial evidence relating to the organizational structure needed fully to implement a desegregation plan for the Cleveland Public Schools." *Id.* at 2.

Despite the clear wording of the December 21, 1977 Order, the planning and administration of Phase I and Phase II transportation was under the direct control and supervision of Business Manager George Mazzaro, and transportation services were being operated out of the Business Department. (Tr. 260, 289, 467, 842–43, 909, 3603). Critical decisions regarding key appointments in the transportation area were made by Mr. Mazzaro (Tr. 3578), and the Business Department determined who to hire as transportation consultants. (Tr. 3575).

Even though the entire record conclusively establishes that transportation planning and administration was not an operational unit within DDI, various administrators misled the Court by testifying under oath in these proceedings that transportation planning and administration was actually under Dr. Fleming's control and within DDI. For example, Mr. Mazzaro stated very early in his testimony that as of March 20, 1980, Mr. Perry "had overall transportation responsibility directly (sic) to Dr. Fleming for all transportation in the Cleveland Public Schools" (Tr. 509–510). Much later on, Mr. Mazzaro was finally forced to agree that "for Phase II and some part of Phase I, [he], in fact, [was] the head of transportation for desegregation as well as for overall responsibility of the district." (Tr. 842–43).

Mr. Mazzaro's testimony, which appears to contain flagrant misrepresentations, misstatements, and inaccuracies, underscores one of the major difficulties which has confronted the Court during the entire process of desegregation implementation. The Cleveland defendants and their employees have frequently been less than candid with the Court. This is evident not only in testimony before the Court but also in submissions which have been made. *See* pp. 374–376 *supra.* As a consequence, in an effort to ascertain certain facts the Court has been forced to conduct hearings which should have been avoided. This practice by the Cleveland defendants and their employees has consumed countless hours of this Court's time and has been dearly paid for by the taxpayers and school children of Cleveland. This practice also casts doubt upon the veracity of other testimony, submissions, and representations made to the Court by the defendants and their employees.

The actual organizational location of the Division of Transportation at the commencement of Phase II is readily visible from exhibits and transcripts of other pro-

ceedings. On March 22, 1980, in the face of massive chaos, disorganization, and public outcry the Cleveland defendants finally deemed it useful to comply with the Order of December 21, 1977, by transferring the Division of Transportation to DDI. The transfer was described in a March 31, 1980 Desegregation Info–Gram, a DDI information newsletter for school staff (Amicus Exhibit 519):

> At an emergency meeting on Saturday, March 22, the Board of Education and Superintendent Peter P. Carlin took the following steps in an effort to resolve difficulties in the Division of Transportation:
>
> * Mr. Richard Knisely was named Director of the Department of Transportation
>
> * Control of the Division of Transportation was moved from the Business Department to the Department of Desegregation Implementation under the direction of Dr. Margaret Fleming, deputy superintendent.

It was the understanding of Superintendent Carlin, Board President Gallagher and those present at the March 22, 1980 Board meeting that this transfer represented a change in organizational structure. The transcript of the meeting of the Cleveland Board of Education reads:

> "The President: Mr. Carlin, Mr. Knisely will be reporting, then to who?
>
> "Mr. Carlin: Mr. President, members of the Board, directly to Dr. Margaret Fleming, Deputy Superintendent of Desegregation Implementation.
>
> "The President: I see. So then we are now taking transportation and putting it under the complete control of the Department of Desegregation Implementation, unlike the case in the recent weeks?
>
> "Mr. Carlin: Yes, Mr. Gallagher, you are correct."

The Court always has viewed the Remedial Order as a comprehensive remedy with various subsidiary, integrally related components. It was the prospect that the transportation of reassigned pupils would fail if planning and delivery functions were not housed within a centralized desegregation department that led this Court, in 1977, to place transportation planning and administration under the direct responsibility of the Deputy Superintendent of Desegregation Implementation. By bifurcating transportation planning and administration, the Cleveland defendants contributed substantially to the disastrous manner in which Phase II transportation was implemented.

The Cleveland defendants argue that there is substantial doubt as to the applicability of the Court's Order of December 21, 1977. This post hoc rationalization is entirely without merit. It is particularly disingenuous because Mr. Mazzaro, Dr. Fleming, Superintendent Carlin, and Board President Gallagher testified that they were aware of the Court's order and believed that it mandated that the Department of Transportation be an operational unit within DDI. (Tr. 496, 1062, 3603, 4182). In addition, the record shows that when Dr. Fleming was nominated as Deputy Superintendent, the Court vacated only the provision that required her approval; it did not affect the other provisions of the Order. *See* Order of December 15, 1978.

The Cleveland defendants also argue that "transportation planning and administration" is ambiguous and therefore the scope of the Order of December 21, 1977 is not clearly defined. Again this position is supported neither by the wording of the Order nor by subsequent developments in this litigation. The Order clearly contemplates that all matters of transportation affecting desegregation will be within DDI. And in any event, the record reveals that the Business Department maintained control over *all* matters of transportation related to desegregation, and not just matters that the Cleveland defendants believed were beyond the scope of the Order.

Another perhaps more critical cause of the transportation breakdown was the poor selection of transportation administrators and the resultant deficiency in planning. The record convincingly establishes that every individual appointed to the position of Director of Transportation during Phase I

and part of Phase II was inexperienced and unqualified to effectively plan and implement the transportation component of the Remedial Order. The record further reveals that the Cleveland defendants either knew, or were confronted with evidence of such magnitude that they should have known, that under the direction of these administrators Phase II would not be implemented in an orderly and efficient manner. In spite of their knowledge, the Cleveland defendants and their employees told this Court only one week prior to implementation that they were confident of success. *See* pp. 375–379 *supra.*

In the seven months prior to the start of Phase II, three men were appointed to serve as Directors of Transportation: Paul High, Thomas Tharp, and William Perry. All three had been long–time employees of the Business Department. (Tr. 27, 42, 259). Mr. Tharp and Mr. Perry, each of whom at various times had "overall responsibility" for desegregation–related transportation, were selected by Business Manager Mazzaro rather than Dr. Fleming (Tr. 145, 507, 510, 3556), even though Mr. Mazzaro testified that he was unaware of the qualifications necessary to head the transportation division. (Tr. 558).

The appointment of Mr. Perry as Director of Transportation until March 29, 1980 exemplifies the manner in which the Cleveland defendants sought to fill important desegregation–related posts. In October 1979, while the Cleveland Board of Education was seeking to hire a new Director of Transportation, Business Manager Mazzaro presented the resumes of two individuals who had expressed interest. (Tr. 604). Since neither of the two were from within the Cleveland system, the Board took no action but instead inquired whether there was "someone in the system that could fill the position." (Tr. 554, 606). Thereafter, no search was made for persons outside the system (Tr. 3559) and Mr. Perry was appointed Director of Transportation with the

approval of the Superintendent and the Deputy Superintendent, and the acquiescence of the Board. (Tr. 618–620).

Mr. Perry assumed this most critical post with *no* prior experience in desegregation–related transportation or in administering a transportation system. (Tr. 3616). In fact, his only experience in the field of transportation was minor, consisting of assisting the Business Manager in the acquisition of buses. (Tr. 144, 553). While he ostensibly was selected because of his knowledge "of the entire Cleveland system," (Tr. 553–55, 3559) there is no suggestion that this rendered him capable of running a major transportation system.[14] Indeed, while Mr. Perry held the post of Director of Transportation for three months, he did not know what qualifications a transportation director should possess. (Tr. 144). Nor did he ever familiarize himself with those portions of the Court's Remedial Order dealing with transportation. (Tr. 146).

Upon assuming the post of Director of Transportation, Mr. Perry was neither given a job description nor were his duties ever explained. (Tr. 145–47). He reported to both Business Manager Mazzaro and DDI head Fleming (Tr. 151), and received instructions from both, although Dr. Fleming was unaware of that fact. (Tr. 3751). Most surprisingly, Mr. Perry testified that he was never responsible for all activities related to desegregation and therefore that during a strategic period there was no single person responsible for running the transportation system. (Tr. 212).

Mr. Perry, perhaps aware of his inability to run the transportation network needed for desegregation implementation, requested assistance from someone with "business experience." (Tr. 163–64). In February 1980, less than two months prior to the start of Phase II, Richard Knisely, an experienced school bus administrator, was hired as a consultant to work under the supervision of Mr. Perry. (Tr. 216, 626, 966, 970). Mr. Knisely, however, who did not start

---

**14.** Mr. Perry testified that the school district's transportation system would be more than one -half the size of the Regional Transit Au-

thority system, with over 500 buses, which provides public transportation for the Cleveland metropolitan area (Tr. 245).

until March, 1980, reported to Business Manager Mazzaro rather than Mr. Perry. (Tr. 216, 989).

The State defendants had serious reservations about Mr. Perry's ability to organize Phase II transportation, and these reservations were expressed to Business Manager Mazzaro and Superintendent Carlin. (Tr. 402–403). These reservations proved highly accurate in the light of subsequent events. Mr. Knisely was used improperly and did not possess sufficient authority to perform his job correctly. (Tr. 392, 416, 418). This was during a time when Superintendent Carlin complained to the State officials that they were not "receiving value for Mr. Knisely's service." (Tr. 392)

The haphazard approach of the local defendants to structuring and staffing the transportation department–a key component to the success of desegregation implementation–is indicative of their overall approach to desegregation implementation. Perhaps no event better illustrates the pervasive maladministration on the part of the Cleveland defendants than the inadequate numbers of buses which were available for the start of Phase II. A description of the salient facts surrounding the efforts to secure the necessary number of buses reveals an administrative incompetence which precludes the vindication of constitutional rights.

The Cleveland defendants had originally contracted with International Harvester for the purchase of one hundred twenty five buses for Phase II. However, as early as November 5, 1979, Business Manager Mazzaro and Transportation Director Perry received correspondence indicating that the projected International Harvester strike would conceivably affect delivery of these buses. (Tr. 167, 704). Inexplicably, this crucial information was not forwarded to Deputy Superintendent Fleming, until nearly one month later, on December 6, 1979. (Tr. 704–706, 3562). In December and January, enough buses were leased to replace those that would not arrive due to the strike. There was, however, one significant problem: many of the buses did not meet minimum Ohio safety and construction standards for school buses. (Tr. 713). Mr. Mazzaro, who was responsible for acquiring these leased buses was aware of this problem in December, 1979 or early January, 1980. As early as February 10, 1980, the Cleveland Board of Education and the State defendants were aware that the leased buses could not be operated without variances from minimum Ohio standards. (Tr. 838). On that date, the defendants held a meeting and the issue of a variance was discussed, although at the time it appeared that the only variance sought would be for hydraulic brakes. (Tr. 838). The record reveals no attempt by the State Board of Education to waive those regulations which it had promulgated.[15]

Nearly one month after knowing that variances needed to be granted, and only eleven days prior to the planned start of Phase II, the defendants made a motion to this Court to grant variances for those buses which did not comply with minimum Ohio standards. (Tr. 377–79, 382–84). The defendants' first motion requested a blanket exemption from eight statutory requirements and over one hundred regulations, covering such critical matters as essential safety features and liability insurance. The defendants had no idea how many buses were involved, nor the nature of the waiver sought. This essential information finally was obtained and another motion was filed on March 17 and granted by this Court the same day. This waiver then allowed the

15. The whole issue of variances from minimum Ohio standards should have been addressed, by the defendants at the latest, at the time the problem was discovered by Mr. Mazzaro. According to his testimony upon learning of the failure of certain of the vehicles to meet minimum standards, Mr. Mazzaro informed counsel of the problem. (Tr. 713). Counsel and the city defendants knew of the problems created by the minimum standards because the same type of fiasco had arisen back in May, 1978, when the City and State defendants were negotiating to obtain transportation vehicles for the system, and the defendants came to this Court asking for a waiver of certain of the State defendants' same self imposed standards as were not being met at this time.

State Highway Patrol to affix decals and conduct inspections, and it was at this time, only hours before Phase II was scheduled to begin, that approximately thirty of the 125 leased buses were discovered to be inoperable. (Tr. 737).

The widespread publicity which resulted from the serious problems encountered in Phase II transportation led the Cleveland defendants to appoint Mr. Knisely as Director of Transportation. According to Mr. Knisely, serious problems face Phase III transportation. See Amicus Exhibit 561. Based on the past performance, and absent important organizational and attitudinal changes, this Court cannot conclude that the extensive transportation network needed for Phase III will be able to transport students effectively, efficiently, and safely.

Deficient planning and maladministration were the primary features of Phase I and Phase II transportation. In addition, there was a failure to comply with an Order of the Court designed to effect a necessary structural change in organization. The responsibility for failure lies directly with the Cleveland defendants. With knowledge and without concern for consequences, they appointed or acquiesced in the appointment of administrators who were not capable of effectively and efficiently implementing desegregation. The responsibility for the debacle of Phase II rests squarely on the Board, Superintendent Carlin, and Deputy Superintendent Fleming.

### B.

### Community Relations

The record developed at the hearings demonstrates that the Cleveland defendants have been unable to fashion either a comprehensive, timely, or effective community relations program as mandated by the Court. Various causes of failure can be cited: failure to hire a community relations program manager with the necessary expertise, experience and managerial skills; failure to develop a system of communication and coordination both within the community relations division and between it and other divisions of DDI; and failure to perform essential pre–implementation tasks in Phase I and Phase II.

Under the Remedial Order, the Cleveland defendants were to "begin immediately" to implement a school community relations program because of the extreme importance of "involving a well informed community in the process of desegregation." Reed v. Rhodes, 455 F.Supp. at 602. The Basic Guidelines for Planning for the Implementation of the Remedial Orders provide that the Cleveland defendants "continually inform the Cleveland public as to the constitutional imperative of school desegregation, the contents of the Remand Opinion, the Remedial Order, the Amendment of June 16, 1978 and their specific plans for implementing the Remedial Order." Special Master's Report of July 13, 1979, 3–4, guideline 9; Order of July 13, 1979, adopting such guidelines. Finally, the status report form adopted by the Court clearly delineated tasks which the Cleveland defendants were required to implement as a part of their community relations program. These tasks included "public dissemination of pamphlets, fact sheets, summaries, charts and other pertinent documents, including summaries of the Remand Opinion and Remedial Order, and school procedures for student safety, caring for ill students, student transportation services, transportation services for parent meetings, etc.;" "pre–implementation information meetings for parents by cluster;" and "establishment of school information distribution centers in clusters." See Special Master's Report of July 30, 1979, Status Report attached thereto, Section D, tasks D3.12, D3.21, D3.23; Order of July 30, 1979 adopting said Status Report form. In addition to Court orders and guidelines that have specifically detailed the necessary tasks, the Court repeatedly has reminded the defendants in open court of their obligation to develop an affirmative community relations program and stressed the importance of getting it under way. See Hearings of March 17, 1977; April 1, 1977; October 27, 1978; September 4, 1979.

Despite these clear Court directives, the Cleveland defendants, over the past two

years, have yet to develop an organized, effective, and on–going community relations program to ensure that the Cleveland community will be informed as to the constitutional imperative of school desegregation. Nor have the defendants developed a program that will allay the fears and anxieties of the community by keeping them well informed of the school district's plans and the positive aspects of the desegregation remedy.

From the record developed at the hearings, it is clear that the Cleveland defendants are unable or unwilling to comprehend the importance of a timely, coordinated and effectively implemented community relations program. Consequently, it comes as no surprise to the Court that the Cleveland defendants necessarily admit that "there were some shortcomings and loose ends left untied in the community relations program." Response of the Cleveland Board of Education to the Proposed Order of the United States for the Appointment of a Desegregation Administrator, 18. The record is replete with evidence concerning the deficiencies in the community relations program. A few examples, by no means exhaustive, amply illustrate the shortcomings.

In December 1978, Mrs. Gloria Towers was selected as the Educational Program Manager for the Desegregation Information Team. There was no public advertisement for this position prior to the selection of Mrs. Towers (Tr. 3714), and no attempt was made to seek the advice or recommendations of agencies with expertise in the area of communications or community relations. (Tr. 3714–15). Although Mrs. Towers did not apply for the position (Tr. 1466), Dr. Fleming asked Mrs. Towers to assume the post. This selection was based on the following qualifications: Mrs. Towers had "extensive residence in the community . . . and was a member of the Cleveland School District" (Tr. 3715). Mrs. Towers had no direct professional experience in communications, nor had she ever taken any courses in community relations or communications. (Tr. 1469–70). She had limited knowledge as to what her responsibilities would be (Tr. 1467–68), and she undertook this responsibility with the understanding that she would acquire expertise along the way by on–the–job training. (Tr. 1710).

The Cleveland defendants repeatedly directed the Court's attention to plans for future performance. However, their ability to implement the Remedial Order must be examined in light of the record of their performance to date. The community relations program, entrusted to someone for on–the–job training, is handicapped by a lack of expertise, a failure of coordination, and a lack of supervision.

The hearings revealed that prior to Phase I implementation, no information concerning liability and remedial orders, the three phases of implementation, or the educational components was disseminated either to the parents or to the community. These materials were not available because they had not yet been written by the defendants. (Tr. 1635–37). When these materials were finally developed by the defendants in February, 1980 for the parents involved in Phase II, this information was not sent to the parents of Phase I students. Dr. Fleming stated that she was responsible for the decision that the information would be sent to the parents of Phase I when it is sent to Phase III parents. (Tr. 1639, 3782).

The hearings also revealed that many tasks required to be performed prior to Phase I had not been carried out. For example, the district was required to hold community meetings to inform parents of plans for Phase I and to answer their questions and hear their concerns. While some meetings were held, due to late notice (24 hours prior to the date of the meeting) or no notice, only a small number of the parents whose children would participate in Phase I attended. (Tr. 1659). Key figures in the desegregation process, the principals of the Phase I schools, were not even required to attend or participate in these meetings. (Tr. 1628 30). Another illustration involves the Desegregation Information Centers which were scheduled to be opened prior to Phase I implementation. None of these centers was actually opera-

tional in September of 1979 at the commencement of Phase I. (Tr. 1589). When some of these centers became operational in November 1979 (Tr. 1772), telephones had not yet been installed, certainly minimizing their effectiveness. (Tr. 1971). In addition, the centers were staffed by poorly trained persons: minimally trained coordinators and untrained student volunteers. (Tr. 1589–90).

Significant shortcomings in planning and supervision are evident in the manner the school district utilized community coordinators to implement the community relations program. The job responsibilities of these employees included manning the phones at the Desegregation Information Centers and serving as liaisons between the schools and the community. (Tr. 1772–74, 1870). Mrs. Towers testified that these coordinators had extensive in–service training prior to Phase I. (Tr. 1764–67). Significantly however, the in–service training did not include such basic information as the history of the desegregation process in the United States, desegregation planning in Cleveland, the Remand Opinion or the educational components of the Remedial Order. (Tr. 2015–16, 1570–71). Mrs. Towers failed to establish a means of communication between the community relations division and other divisions of DDI necessary to provide the community relations staff with on–going or current information about desegregation–related events. (Tr. 1918–19). As a result those persons responsible for dealing with the questions and the concerns of the Cleveland community were not provided with essential background information to enable them to communicate with a potentially con-

cerned or anxious community with accuracy and assurance.

The record reveals that throughout Phase I and Phase II Mrs. Towers failed to supervise adequately the Desegregation Information Team, with the result that many of the community relations activities were neither planned nor coordinated by or with her. For example, the community coordinators were responsible for developing significant portions of their own program without direction or guidance from Mrs. Towers (Tr. 1733–35). Additionally, volunteers trained by Ohio Bell and by the Coordinator of Volunteers for the Cleveland Public Schools staffed the phones at the Desegregation Information Centers even though Mrs. Towers testified that she had no knowledge of the content of the in–service training for these volunteers or whether the training included information on desegregation implementation. (Tr. 1689–90). Mrs. Towers did not seek this information because the Coordinator of Volunteers was not within a division of the DDI. (Tr. 1681–82). A third example of poor supervision is evident in the lack of coordination of activities between the media team and Mrs. Towers. She was neither consulted about priorities that should be addressed, nor about problems which coordinators may have found in the community. (Tr. 1647–48). The lack of coordination of activities between the media team and Mrs. Towers continued through Phase II because she was unaware that television releases had been prepared. (Tr. 1754).

Based on performance the community relations program can only be characterized as a failure.[16] It is due in large part to the

---

16. Despite overwhelming evidence to the contrary, the Cleveland defendants claim that there has been substantial compliance with the Court's order to develop and implement a community relations program. During the hearings the defendants offered into evidence a multitude of exhibits to support this representation. However, close examination demonstrated that many of these documents were misleading and viable on paper only. The documentary evidence offered by the defendants in the areas of transportation and educational components suffers from comparable limitations.

Illustrative of the defendants' efforts to demonstrate compliance is the Community Outreach II Plan (Defendants' Exhibit 123). This plan set forth the following objectives: (1) the number of community coordinators will be increased to effectively carry out Phase II tasks; (2) the community coordinators, as a group, will attend not less than five in–service training sessions in preparation for their assignment; (3) the community coordinators will disseminate desegregation–related information using all avenues of communication such as public news media including newspapers, radio and

inexperience and lack of expertise of the division head in the areas of administration and community relations and a confusion on her part regarding her position within the school district's operational structure. Documents submitted to the Court indicate that Mrs. Towers is the administrator of the community relations division. *See* Phase I Status Report of August 13, 1979, Section D, task 3.11; Phase I Status Report of January 14, 1980, Section D, task 2.00. However, she testified that she is not head of the community relations division. (Tr. 1473, 1743–44).

The testimony also reveals a basic structural weakness within DDI which has contributed to the defendants' inability to develop and implement a meaningful and workable program. Responsibility for dealing with the major community relations problems which have confronted the district since Phase I has not been given to Mrs. Towers by Dr. Fleming. As a result, on those occasions when public relations services were most needed, the community relations division has not been in a position to be of assistance. For example, Mrs. Towers was not informed of the Phase II transportation difficulties as they occurred in March 1980 (Tr. 1961–62), nor was she informed of the disruption at John Marshall High School in the fall of 1979 or the incidents which occurred at Mooney and Jefferson Junior Highs in the spring of 1980. (Tr. 1953–56). Mrs. Towers was not asked to provide information to assist the district regarding school closings (Tr. 1963–65), and was not informed of the district's plans to develop additional bus sites, even though substantial community reaction should have been anticipated. She was not even consulted when

the defendants submitted pleadings representing unpreparedness in the community as the grounds for divergence from the June 1978 plan. (Tr. 1651–52)

The community relations program is another classic example of the programmatic failures which have characterized the defendants' implementation of Phases I and II. The defendants appear to be aware of the critical nature of a timely, comprehensive, organized, and effective community relations program. However, they have failed to structure and staff their program in a manner which makes performance possible. This is evidenced by the appointment of a Program Manager lacking expertise, experience, and the necessary managerial skills; the failure of communication and coordination within the Community Relations Division and between it and other Divisions of DDI; the failure of the Deputy Superintendent of Desegregation Implementation to assess the effectiveness of the community relations program and to take corrective action; and the abysmal record of performance in Phase I and Phase II. The defendant's failure in community relations represents not only a failure to comply with the letter and spirit of the court orders but also demonstrates a callous indifference to the students, parents, and residents of the Cleveland community.

## C.

### Educational Components and Other Ancillary Relief

The Remedial Order provided that a number of educational programs be designed and implemented to assist in the

---

television; (4) the community coordinators will assist principals in planning pre-implementation student meetings to ensure that all Phase II students become knowledgeable of the constitutional imperative of Court–ordered desegregation.

Despite the existence of the plan, the defendants were in no position to achieve the objectives because they failed to establish the means for implementation. (1) No criteria have been established to ascertain or determine the effectiveness of the community relations program. In fact, no review of effectiveness has been

undertaken (Tr. 1981 82). (2) The Administrator of the community relations program is without knowledge as to whether the coordinators had attended the five in service training sessions because she has not established a means of verifying their attendance. (Tr. 1983-84). (3) There is no coordinating mechanism for releasing community relations information to the media. (Tr. 1647). (4) There are no means of determining whether the community coordinators are knowledgeable about the constitutional imperatives behind the Court's Remedial Order.

elimination of the vestiges of a dual educational system. These mandated educational components are in many respects at the core of the Remedial Order. They are fundamental, indeed crucial, components of a workable, desirable and constitutional desegregation remedy. They serve to remedy the educational harms which have been suffered by school children due to intentional segregation and pervasive inequality. They are intended to ensure that existing and future programs are administered in a non-discriminatory fashion, thereby protecting the rights of all students. Finally, the educational components will ensure that no intentional or avoidable resegregation occurs in the future.

Under the Court's Remedial Order, the educational components are neither "afterthoughts" nor "ancillary concerns." They are not aspects of the remedy that can be implemented at some convenient time after student reassignment has occurred. Rather, as the Cleveland defendants admit, they are to be planned and implemented alongside pupil reassignment. *See* Response of the Cleveland Board of Education to the Proposed Order of the United States for Appointment of a Desegregation Administrator. As the Court has consistently reiterated, the letter and spirit of the orders contemplates that the educational components will complement and be contemporaneous with the transportation of pupils.

The Court is well aware that the process of planning, developing, and implementing the educational components is ongoing. However, the mere fact that some aspects of the process have begun at the time of reassignment in no way constitutes substantial compliance with the orders of the Court. Rather, the existence and degree of planning and implementation represent the appropriate inquiries.

The Cleveland defendants contend that the failures in planning and implementation of the educational components are partially explained by the chronology of events prior to Phase I. First, there was only a short interval of 1½ months, between approval by this Court of Plan A [17] on July 30, 1979 and Phase I implementation. Second, the Board reasonably anticipated that the initial phase of desegregation would involve all or some of the junior high schools.

The position of the Cleveland defendants with respect to chronology is without merit for several reasons. First the defendants have been aware that a system-wide remedy was required since liability was established in 1976, see *Reed v. Rhodes*, 422 F.Supp. 708, and that educational components and other ancillary relief were integral parts of the Remedial Order since February of 1978. *See Reed v. Rhodes*, 455 F.Supp. 569. As with certain other parts of the remedial plan, the planning and implementation of the educational components did not depend on the ultimate movement of students and were to be undertaken by the defendants immediately after promulgation of the Remedial Order. However, in the year prior to issuance of the stay and after the Remedial Order was issued, there were no significant efforts on behalf of the defendants to comply with the mandate. *See* pp. 379-380 *supra.* Second, even after the Court of Appeals for the Sixth Circuit issued a stay of the Remedial Order on January 8, 1979, the Cleveland defendants acknowledged their continuing responsibility to plan for implementation. (Tr. 3862–63). Any doubt concerning this ongoing responsibility was laid to rest with the Order of May 14, 1979 which clarified the continuing duties of the defendants to plan during the stay. Thus for a period of at least 1½ years before Phase I the defend-

17. Due to the defendants' recurring problems in planning and to ensure that implementation was undertaken in a logical sequence, the Court adopted the Special Master's recommendation that the defendants be given three alternative schedules for implementation of the remedial plan. After conducting and submitting feasibility studies on each alternative, the de-

fendants indicated that Plan A, the present implementation schedule, was their preference. The defendants claim that Plan A presented great difficulties because it involved the Phase I cluster least prepared in terms of educational components. However, this implementation schedule was chosen by the defendants.

ants were responsible for conducting necessary planning for a system–wide remedy which included educational components and other ancillary relief.

The defendants' contention that they were caught off guard by an implementation schedule which did not begin with the desegregation of junior high schools is equally unsupportable. It is true that the November 1, 1978 plan submitted by the defendants was approved by the Court on November 10, 1978, and involved the desegregation of the system's junior high schools. This was necessitated, however, solely by the fact that the Board believed, and the Court concurred that second semester implementation was feasible only for junior high schools. For elementary and senior high schools, mid–year implementation was adjudged educationally unsound and impracticable. See Hearings before Special Master, November 7–8, 1978. Implicit in the November 1, 1978 plan was the fact that full implementation would follow in the Fall of 1979. When the first phase of desegregation was shifted to the Fall of 1979, it simply was not reasonable to believe that full implementation would be limited to junior high schools, especially in light of the defendants' own belief that senior high and elementary school desegregation should not occur during the second semester.[18]

Testimony and documentary evidence presented during the hearings on civil contempt and the Special Master's Report of January 31, 1980 demonstrate that the Cleveland defendants were not prepared at the start of Phase I to substantially implement those portions of the Remedial Order mandating educational components and other ancillary relief. Indeed, the positions of certain key administrators had not been filled until mid–August, 1979, thereby insuring that no implementation would take place until well into Phase I. Furthermore the record shows that Phase II planning and implementation were seriously deficient.

## 1. Affirmative Reading Programs

The Remedial Order requires the Cleveland defendants "to institute an affirmative reading skills program which does not segregate." The Order also mandated that the district "conduct an additional study to determine the nature and extent of disparities in the reading skill test scores of minority and white pupils in the Cleveland public schools at the elementary, junior and senior high levels" Reed v. Rhodes, 455 F.Supp. at 599. The status report form specified particular tasks that were to be undertaken by the defendants to comply with the general demands of the Remedial Order. See Status Report form, Section G.

The record reveals that inadequate efforts have been undertaken by the Cleveland defendants to comply with the orders of the Court. Numerous tasks specified in the status report form were either not timely completed or inadequately completed. There have been serious deficiencies in both the planning and implementation phases of the affirmative reading program which have crippled compliance.

The Helping Teacher Program which was established in September 1979 was substantially the same as an affirmative reading program which had been developed in 1975 to assist classroom teachers in identifying, diagnosing, and remedying reading problems. (Tr. 4638). However, while the 1975 program was staffed by twenty reading consultants, the number of consultants employed for Phase I in elementary schools had been cut to ten (Tr. 4705). Plans provide for a staff of thirteen consultants for eighty to eighty–five elementary schools when Phase III is finally implemented and

18. The Court cannot conclude that the defendants either actually or reasonably believed that Phase I would consist solely of junior high schools. However the issue is rendered somewhat academic by the documented failure of planning and implementation at Phase II junior high schools. It is also significant to note that in at least one pleading submitted to the Court prior to Phase I, the defendants stated that Gallagher Junior High School was not prepared for desegregation in September, 1979. See Defendants' Motion to Permit Temporary Assignment of Children in Residential Zone 7027.

the system is fully desegregated, a number which is deemed inadequate by Mr. David Cox, Assistant Superintendent for Curriculum and Instruction. (Tr. 4705–06).

When Phase I began, the Helping Teacher Program was not fully implemented in the designated twenty–six elementary schools. There were shortcomings in the timing and adequacy of task completions in the assessment of student progress (Tr. 4640), school demonstrations by teachers (Tr. 4643), and supervision of the consultants. (Tr. 4642). In addition, when the Helping Teacher Program was instituted at the elementary level, there was no effort made to redesign or adapt the program to meet the unique needs of elementary school children. (Tr. 4671). The Court has searched the record in vain for any indication of genuine efforts on the part of the defendants or their employees to determine systematically how reading skills can be improved and disparities between races eradicated.

The English Basic Skills Lab was the affirmative reading program designed for the secondary level. (Tr. 4649). Again, the record shows planning and implementation not in compliance with the directives issued. Of the eleven secondary schools affected by Phase I reassignments, only four conducted the program. (Tr. 4653). The remainder simply carried on whatever programs were in operation prior to the Remedial Order. (Tr. 4653–55). At the commencement of Phase II not a single reading lab had been established at any of the sixteen Phase II junior high schools, and only three labs— one full–time and two part–time—are currently in operation. (Tr. 4624).

The failure of the Cleveland school district's affirmative reading programs is evidenced by the limited number of students that have had access to this remedial educa-tion program in the face of great need. While the majority of Cleveland students (60%) are reading below average, thousands of these students are not being reached by these labs. (Tr. 4715). In Phase II schools, only eighty–seven pupils are using the three reading labs. (Tr. 4663). And in total, only slightly more than 1,000 students have been reached by the programs. (Tr. 4716).

The Cleveland defendants' claim that reading labs could not be established in the remaining Phase I and II schools because certified teachers could not be found is not persuasive. In this regard, the Court notes first that prior to desegregation implementation but after the Remedial Order was issued, Mr. Cox recommended that twenty–one reading specialists be cut. (Tr. 4730). This recommendation was carried out. (Tr. 4729). The Court also finds that the defendants then failed to take meaningful steps to secure personnel needed to staff the remedial programs.[19]

In the face of what can be characterized only as a massive failure to implement a key educational component to date, the Cleveland defendants provide no reasonable assurance that more labs will be established and operative by September 1980. (Tr. 4716–17). Their claim of impossibility of compliance is factually unsupportable.

2.  *Counselling and Career Guidance*

In devising an appropriate remedy, one of the Court's primary concerns was the identification and elimination of discriminatory guidance practices. This is because of evidence which indicated that racially imbalanced classes were partly the result of stereotyped counselling practices and course-offerings which vary from school to school. This concern is reflected in the Remedial Order:

---

**19.**  The record shows only limited efforts by the defendants to recruit certified teachers from outside the system (Tr. 4626). Two alternatives have been suggested as ways to provide adequate staff to fully implement the Remedial Order: contracting out operation of the labs to the Education Departments of local Colleges and Universities, and utilizing volunteers. The defendants have never considered contracting out the operation of the reading labs, nor have they any evidence that such a solution would not work. The district also can utilize parents or other community volunteers to staff reading programs. The Emergency School Assistance Act (ESAA) which fully funds the reading labs does not require that certified teachers operate the labs. (Tr. 4730). There is no showing that volunteers have been sought.

In order to reduce the pressures on students undergoing desegregation and to prevent resegregation resulting from curriculum or program choices of students the defendants shall institute an effective nondiscriminatory counselling and career guidance program. The program shall ensure that students are counselled on a racially nondiscriminatory basis as to opportunities in employment or higher education and as to vocational and special educational programs.

*Reed v. Rhodes*, 455 F.Supp. at 599.

This concern with counselling and guidance practices also is evident in the status report form which was designed to make the review of such practices top priority. Unfortunately, the function of the status report in this area largely was neutralized by inaccurate, incomplete, or misleading entries. For example, a status report was submitted to the Court by Dr. Maroon, the Supervisor of Guidance, which showed August 27, 1979, as the actual completion date of the review of discriminatory practices. In fact, the review had not even been started by that date. (Tr. 3428–29). The status reports also erroneously stated that the guidance counsellors were informed of the results of this review. (Tr. 3429–30). In actuality, and contrary to information that was provided to the Court, there was no systematic review of discriminatory practices. Rather, each counsellor was instructed to identify those discriminatory practices which exist in the school where he or she was employed, and then to eliminate them. (Tr. 3447–48). These counsellors were not required to report their findings, and Dr. Maroon has no knowledge of whether any discriminatory practices were found or corrected. (Tr. 3437).

The status report form outlined certain other procedures to be followed. For example, individual counsellors were to instruct and educate the faculties of their respective school on the discriminatory practices. Unfortunately, Dr. Maroon can provide no information about this process; she has reviewed no reports and knows of no outcomes or additional follow–ups. (Tr. 3433–

37). Additionally, the Status Report form contained a requirement of "holding a faculty meeting ... to examine practices and materials relating to discriminatory items." Status Report H3.205. However, Dr. Maroon approved a counsellor–led faculty meeting to discuss "Body Language" despite this earlier directive that discriminatory practices were to be addressed. (Tr. 3446–51). Finally the two workshops conducted to train counsellors prior to the start of Phase I were inadequate. (Tr. 3394). In fact, no training designed specifically for guidance counsellors was conducted prior to October 1979. (Tr. 3420).

As the status reports and testimony substantiate, the failure to establish an effective non–discriminatory counselling and guidance program has been caused by deficiencies in supervision and leadership. Dr. Evelyn Maroon was not appointed as Supervisor of Guidance, until July 1979, shortly before Phase I implementation. Her position had been eliminated for financial reasons after the Remedial Order was issued. When she assumed the post, she had extensive experience in counselling but no experience with counselling in a desegregated setting. (Tr. 3364). Her only direction and guidance were provided by the guidelines and responsibilities contained in the Remedial Order and in the status report form. Dr. Maroon was unaware of any budget or staff to assist her in her duties and has no knowledge of how much money has been expended on that portion of the Remedial Order relating to her duties. (Tr. 3385).

Dr. Maroon failed to establish procedures whereby information concerning those aspects of the guidance counselling program which pertain to desegregation is collected and reviewed. Significantly, she is unaware of the disproportional racial make up of the educable mentally retarded, learning disability, and major works programs (Tr. 3396–98), even though guidance counsellors have an important input into placement decisions. She also has no information regarding the racial composition of suspensions, even though it is an area of concern to counselling. (Tr. 3463). Additionally

while individual counsellors were directed to initiate a minimum of two projects to facilitate desegregation in their buildings,[20] Dr. Maroon cannot confirm that listed projects are in place, nor can she report on the success or failure of a single project. (Tr. 3529–30).

The deficiencies described above lead the Court to find that planning in the area of guidance and career counselling was generally inadequate and implementation faulty. The actions taken by the Cleveland defendants and their employees cannot be considered as complying in a substantial manner with orders of the Court.

### 3. Cooperation with Educational, Business, and Cultural Institutions

Under the Remedial Order, the Cleveland defendants were encouraged to "make all reasonable efforts to develop a plan for involving local educational, business and cultural institutions in a viable educational partnership" *Reed v. Rhodes*, 455 F.Supp. at 600. This portion of the Remedial Order was necessitated after hearings by the Education Committee of the Cleveland Board revealed "that higher education, business, and cultural institutions are relatively untapped resources standing ready to provide substantial assistance once the defendants actually seek their assistance." *Id.* Due to inaction by the Cleveland defendants, the Court adopted recommendations by the Special Master which provided via the status report form for the performance of more specific tasks. *See* Status Report form, Section R. This method of enriching the Cleveland schools through collaborative programs is not optional; it is required by Court order.

Evidence produced during the hearings on contempt and the Special Master's Report of January 31, 1980 suggests that there has been almost total non–compliance with Court orders in the area of collaborative programs. Confronted with overwhelming evidence of inaction, the Cleveland defend-

ants concede that "Progress in the area of cooperation with colleges and universities, business and cultural institutions had admittedly been slow." Response of Cleveland Board of Education to the Proposed Order of the United States for the Appointment of a Desegregation Administrator, 17. They claim that this delay is "somewhat understandable" because the cooperation is dependent upon outside entities.

The defendants indeed are correct that the envisioned collaborative programs are to be entered into with outside entities. But it is obvious that these institutions will not be in a position to provide much assistance if they are never contacted, or if their offers of assistance are rebuffed. Regrettably, the record demonstrates that this has been the case.

Mr. Ronald Handy, the Board of Education's liaison with educational, business, and cultural institutions has initiated few contacts with such institutions in the Greater Cleveland area. (Tr. 2800). This failure is due to a number of factors. First, Mr. Handy's background indicates that he has had no experience dealing with institutions, except in the area of student–teaching programs. Second, when Mr. Handy attempted to overcome this limitation by visiting Boston in December, 1979, he was refused permission by Dr. Fleming, despite her knowledge that the Boston school system has made collaborative arrangements with area institutions an integral component of desegregation. (Tr. 2898–2900). When Mr. Handy assumed the position, he was provided with no guidance concerning his duties and responsibilities other than the status report form and the Remedial Order, and even his understanding of the Remedial Order was faulty. (Tr. 2793). Mr. Handy also has been denied sufficient staff, and the legal counsel necessary to clarify the legal relationship between the district and the cooperating institutions. (Tr. 2803, 2825–27). The effect of the absence of guidelines, inadequate staff and supervision, and

**20.** Dr. Maroon changed the requirement to one project because she felt that the counsellors

were "overworked." (Tr. 3514 15).

general lack of experience has been to leave the planning and implementation of the collaborative programs floundering.

Despite the wealth of colleges and universities, civic and cultural organizations, and local businesses in the Greater Cleveland area, the Cleveland defendants can point to only one collaborative program, and that is with distant Wooster College. The defendants' attempt to cast blame for the failures of the collaborative programs on the refusal of local institutions to participate is entirely without support and flies in the face of substantial evidence to the contrary. The defendants were aware of the district's great need for assistance and the wealth of resources commanded by local civic, educational, and business institutions. (Tr. 4246). However, on numerous occasions when local institutions like the Greater Cleveland Growth Board and the Cleveland Commission on Higher Education offered assistance to the Board of Education, this assistance was refused. (Tr. 4245–46; Amicus Exhibit 566).

The Cleveland Foundation in its 1979 Annual Report (Amicus Exhibit 566) accurately depicts the conduct of the Cleveland defendants in the area of collaborative programs:

> Several attempts to bridge the gulf between the school system and a concerned public blossomed and died quickly. This was typified by a grant which the Distribution Committee of The Cleveland Foundation authorized and then rescinded. With the encouragement of respected civic leaders, the Cleveland Commission on Higher Education had offered expertise from its member colleges and universities to help the school system solve its much publicized management problems. The George Gund and Cleveland Foundations granted $50,000 for the project only to have the school administration, after being initially receptive, refuse to participate. Several other offers of outside assistance also were ignored or declined.
>
> In such a chilly environment, the federal court's mandate that the community's

outstanding corporate academic and cultural institutions enrich the school system's educational offerings has not been fulfilled.

The Cleveland Foundation 1979 Annual Report, 26.

The Cleveland defendants were not simply indifferent to offers of assistance by outside institutions; they actually refused to participate in such programs. Under these circumstances, it is not surprising that there has been no substantial compliance with the directives of the Court.

### 4. Testing and Ability Grouping

The goal of eliminating existing discrimination and preventing resegregation in the Cleveland public schools prompted the Court to provide in the Remedial Order that the district "insure that all tests, whether standardized, criterion referenced, or teacher made, are developed, administered and scored in a non–discriminatory manner" and "that the results of such tests are used in a non–discriminatory manner." Reed v. Rhodes, 455 F.Supp. at 598. To accomplish this purpose the Court mandated that the Cleveland defendants undertake a series of tasks designed to insure adequate pre–implementation preparedness. See Status Report form, Section J.

Testimony and documentary evidence submitted to the Court reveal that numerous delays in both planning and implementation in the area of testing and ability grouping have occurred, with the consequence that the district is not in the position to ensure the existence and utilization of non–discriminatory testing procedures for Phases I and II. The conduct to date demonstrates little reasonable hope that seasonable and substantial compliance will be forthcoming during Phase III and thereafter.

Dr. Kilbane–Flash, a former associate of Dr. Fleming when both were in the Division of Research, is presently Director of Research and Testing and has functional responsibility for desegregation–related testing matters. (Tr. 2927). She was appointed to the position without any other candi-

dates being interviewed or without the position being posted. (Tr. 2930). Performance to date in the Division of Research and Testing suggests an absence of direction and supervision in ensuring that tasks critical to desegregation implementation are carried out in a timely fashion. For example, during Phase I no materials were circulated to teachers on the subject of teacher-made tests. (Tr. 3058). No plan for the review of teacher-made tests was established until February, 1980 (Tr. 3061), and even then, the sampling review is not to commence until the conclusion of school in the summer of 1980. (Tr. 3065). Thus during Phase I and a significant part of Phase II, there were no attempts to insure that teacher-made tests were developed, administered, and scored in a non-discriminatory fashion.

With regard to standardized tests, the record shows that when Phase I began there was no completed evaluation of their potential bias. When the evaluation finally was finished, it ignored the critical factor of actual results. Dr. Fleming was certainly correct when she testified that actual test results are "one element . . . you need to determine bias." (Tr. 3752). However, while she was under the impression that test score data by race had been employed by the Division of Research and Testing in conducting its evaluation (Tr. 3752), such was not the case. (Tr. 2962). The two steps employed by the Division of Research and Testing—review of each question for bias (Tr. 3151), and review of the publisher's efforts to identify and eliminate bias test terms (Tr. 3156)—while useful, are not sufficient. Indeed, this is recognized by the Cleveland defendants' promise that test results by race will be compiled by the end of the present school year. (Tr. 3230).

In addition to the evaluation of tests for bias, the Remedial Order requires that currently segregated classes be eliminated and future ones prevented. *Reed v. Rhodes*, 455 F.Supp. at 598. To achieve compliance, the Cleveland defendants have established a Compliance Review Team to check for one-race or racially-imbalanced classes at desegregating schools during Phases I, II and III. However, the actual ability to identify and report segregated classes effectively is greatly in doubt. Mr. Arnold Brown who was appointed coordinator of the Compliance Review Team, failed to notice or report the existence of nine one-race classes in Westropp Junior High School in March of 1979 when he was charged with monitoring desegregating schools to which Addison Junior High students were reassigned. *See* Deposition of Arnold Brown, taken on June 1, 1979, filed June 4, 1979.

### 5. Staff Development and Student Human Relations Training

The Remedial Order recognized that "staff development and training of students in human relations is essential if desegregation is to be effective." *Reed v. Rhodes*, 455 F.Supp. at 601. At the time, the Court noted that the "defendants have been involved in considerable planning in this area." *Id.* The Court now finds that this advanced planning generally has had a positive impact upon Phase I and II implementation, and that the prospect of achieving substantial compliance with the remedial orders in these areas is within reach.

The Court does find that serious organizational and planning shortcomings impeded timely and effective completion of important pre-implementation tasks. For example, student training was delayed because Dr. Fleming did not select Mr. John Ryan to run the comprehensive student training program until August 20, 1979, barely three weeks prior to Phase I. (Tr. 2472). After his selection, Mr. Ryan was hampered in the performance of his duties because his immediate predecessor, Dr. Bert Holt, failed to provide him with reports of what had been accomplished or which students had been trained. (Tr. 2475). As a result of these factors, by January 1980, at least 30% of Phase I students had received *no basic information about desegregation* (Tr. 2526). In the staff development area approximately ½ to ⅔ of the teachers in Phase I schools did not attend training meetings prior to Phase I. (Tr. 2222). This apparently was due to the voluntary nature

of the training, which contributed to a situation where teachers most in need of training were not being reached. (Tr. 2177–78). Dr. Bert Holt now claims that staff training is being placed on a mandatory basis (Tr. 2407), although there is no information yet available regarding how many teachers actually have been trained. In addition to voluntary training, the lack of coordination between staff development personnel and building principals has contributed to training delays. (Tr. 2178). This lack of coordination appears to have arisen due to poorly defined responsibilities and confusion among staff.

The overall performance of the Cleveland defendants in planning and implementing the educational components and other ancillary relief has been dismal. Of course, serious deficiencies in planning and implementation are not limited to the five areas addressed: affirmative reading, guidance and career counselling, collaborative programs with educational, cultural and business institutions, testing and ability grouping, and staff development and student human relations training. Serious shortcomings also exist in the planning and implementation of the magnet schools,[21] a core area of the Remedial Order. *See Reed v. Rhodes*, 455 F.Supp. at 599–600, and continue to plague promulgation of a student transfer policy. *See* OSMCR Report of March 8, 1979; Special Master's Report of January 31, 1980.

The Court does not wish to be misunderstood as to what the record reflects in the area of educational components and ancillary relief. Obviously limited progress has occurred in some areas, but that does not constitute compliance with the Remedial Order. If it did the Court would be unable to protect in any meaningful way the constitutional rights of the plaintiff class. The entire record of this litigation demonstrates the lack of progress in core areas of the Remedial Order.

21. OSMCR Report of January 11, 1980, 13. *See also* OSMCR Report of February 1, 1979; Special Master's Report of January 31, 1980,

## III

### A.

■ The Cleveland defendants are "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County School Board*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). It has been the failure of the defendants to perform their affirmative obligations that has led the authority of this Court to be invoked. *See Reed v. Rhodes*, 422 F.Supp. 708 (N.D.Ohio 1976), *aff'd*, 607 F.2d 714 (6th Cir. 1979), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980).

■ In formulating a remedy and ensuring that an appropriate remedy is implemented, a court possesses the full range of equitable powers. The Supreme Court has stated that "once a right and a violation have been shown, the scope of the district court's equitable power to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). The district court has a duty to ensure that a remedy affords the prospect of prompt relief. *Green v. County School Board supra* at 439; *Griffin v. County School Board*, 377 U.S. 218, 232, 84 S.Ct. 1226, 1233, 12 L.Ed.2d 256 (1964).

The Court is well aware of the traditional respect which must be accorded to the broad discretionary policies of school officials for the local authorities "have the *primary* responsibility for elucidating, assessing, and solving these problems ..." *Brown v. Board of Education*, 349 U.S. 294, 299, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955). *See also Milliken v. Bradley*, 433 U.S. 267, 281, 97 S.Ct. 2749, 2756, 53 L.Ed.2d 745 (1977). "Remedial judicial authority does not put judges automatically in the shoes of

17 18; letter of Dr. Gordon Foster to Deputy Superintendent Margaret Fleming, July 18, 1980.

school authorities whose powers are plenary. Judicial authority enters only when the local authority defaults [in its affirmative obligations]." *Swann v. Charlotte–Mecklenberg Board of Education, supra* 402 U.S. at 16, 91 S.Ct. at 1276.

Following a finding of liability, it is common in institutional reform litigation for courts to appoint parajudicial officers to assist in conducting and overseeing actual implementation of the remedies. These officials have been given various names: masters, special masters, examiners, experts, monitors, referees, commissioners, administrators, observers, committees, panels, etc. *See* Special Project: The Remedial Process in Institutional Reform Litigation, 78 Colum.L.Rev. 784, 826–27 (1978). Because these officials inevitably and necessarily displace certain functions and responsibilities that otherwise would rest with those who control the institution, they have been classified as a group as "neoreceivers." [22] Comment, Equitable Remedies: An Analysis of Judicial Utilization of Neoreceiverships to Implement Large Scale Institutional Change, Wis.L.Rev. 1161 (1976).

■ Under appropriate circumstances a district court having desegregation responsibilities may order personnel shifts in order to effectuate implementation of the remedial orders. *Morgan v. Kerrigan*, 509 F.2d 599 (1st Cir. 1975); *Davis v. School District of City of Pontiac*, 487 F.2d 890 (6th Cir. 1973). Similarly, when more common equitable remedies prove to be inadequate, a court in equity may impose less common ones such as receiverships to take over temporarily the essential functions of the institutional decision makers to ensure that the remedy is successfully implemented. *See Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976), *cert. denied*, 429 U.S.

1042, 97 S.Ct. 743, 50 L.Ed.2d 755 (1977) (receivership imposed on South Boston High School); *Turner v. Goolsby*, 255 F.Supp. 724 (S.D.Ga.1966) (receivership in school desegregation setting); *Newman v. State of Alabama*, 466 F.Supp. 628 (M.D.Ala.1979) (receivership imposed on Alabama state prison system); *Perez v. Boston Housing Authority*, —— Mass. —— 400 N.E.2d 1231 (1980) (receivership imposed to achieve a restructuring of the housing authority); *Society for Good Will to Retarded Children, Inc. v. Carey*, 466 F.Supp. 722, 727 (E.D.N.Y.1979). *See* note. Monitors: A New Equitable Remedy? 70 Yale L.J. 103, 107–13 (1960).

■ The fundamental test governing the imposition of a temporary receivership is one of reasonableness under the circumstances. *Morgan v. McDonough, supra* at 533. The relevant considerations or principles can be obtained from a review of those cases in which the issue of a receivership has been discussed. In every instance that a court has been forced to utilize a less common equitable remedy, there have been findings of an inability to comply substantially with court remedial orders. Thus in *Morgan v. McDonough, supra*, a combination of circumstances which made compliance unlikely justified the particular receivership imposed: repeated or continuous failure of the officials to comply with a previously issued decree; a reasonable forecast that the mere continued insistence by the court that these officials perform the decree would lead only to "confrontation and delay"; and a lack of any leadership that could be expected to turn the situation around in a reasonable time.

In *Newman v. State of Alabama, supra*, the Court first conducted hearings to determine whether the defendants had complied with previous remedial orders dealing with

---

**22.** The process leading to the utilization of neoreceivers involves the failure of the political process to produce an institution conforming to law. "Those subjected to the illegality, who are usually politically powerless (*cf. United States v. Caroline Prods. Co.*, 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783, 82 L.Ed. 1234 (1938)), turn to the courts for the vindication of their rights. Injunctive remedies are called for but

the judge lacks expertness in the particular field, and lacks time even when he chances to have the knowledge and sometimes implicitly encourage acceptance by the parties and the general public of the results of the judicial intervention." *Perez v. Boston Housing Authority*, —— Mass. ——, 400 N.E.2d 1231, 1250 n. 29 (1980).

prison conditions. The Court found that "the overwhelming weight of the evidence presented at the time established that what was true in 1972 and in 1976 is still true today. While some progress had been made, the Board of Corrections has not in several critical areas achieved substantial compliance with the Court's orders." 466 F.Supp. at 630.

An inability to comply with court orders also was evident in *Perez v. Boston Housing Authority, supra.* The Supreme Judicial Court, in upholding the imposition of a receivership in order to restructure the Boston Housing Authority, found that "there ha[s] been massive trouble with eliciting performance of injunctive orders and finally of a comprehensive decree." 400 N.E.2d at 1251. The *Perez* court noted that the good faith effort of the Board members was not an issue because the "rights of tenants were not to be equated merely with the Board's best efforts . . . . The tenants were entitled to a leadership that had the potential for reaching out to achieve the objectives set by the law." *Id.*

 The present record overwhelmingly establishes the scope and nature of the failure of Cleveland school authorities to carry out their obligations to implement the remedial and other court orders in an effective and timely manner. The failure is most dramatically highlighted by the exceedingly poor record of implementation in Phases I and II in the areas of transportation, *see* pp. 380, 385 *supra,* community relations, *see* pp. 385, 398 *supra,* and educational components and ancillary relief, *see* pp. 388, 391 *supra.*

The causes of failure are deeply rooted in the inertial nature of the school system and its traditional administrative structure. The record amassed to date indicates beyond any reasonable doubt that the system is not structured in such a manner as to achieve substantial compliance with the mandates of desegregation. The systemic deficiencies exist in both administrative and fiscal areas. The deficiencies in the organizational structure include the lack of job descriptions, the absence of clear lines of authority, and the absence of clear departmental or divisional organization. Additionally, poor to non–existent reporting and information systems preclude accountability and the capability of rectifying the systemic dysfunctions. While these structural deficiencies were brought to the defendants' attention by numerous outside experts, *see* pp. 377, 379 *supra,* they are perpetuated by an institutional inertia and a resistance to the systemic reform ordered by the Court to remedy unlawful conditions.

Confronted with a system not structured to achieve compliance, the Cleveland defendants have failed to take the necessary steps to ensure that the system can deliver on its "voiced" commitment to desegregation. Ultimately the commitment of the defendants to achieve desegregation must be measured by their actions rather than words. No commitment truly exists when there is no meaningful effort undertaken to address known systemic deficiencies or to staff the Department of Desegregation Implementation with persons capable of planning and implementing desegregation.

The Cleveland School Board has employed top administrative personnel who are inexperienced, unqualified, and ineffectual in organizing an efficient Department of Desegregation Implementation and carrying out the discrete tasks necessary to achieve compliance with the orders of this Court. In the critical area of transportation, the defendants repeatedly failed to seek and retain a qualified division head. And after encountering fairly serious problems in Phase I, the defendants allowed self–confessed novices–long–time employees of the system with no practical experience in managing a large transportation system–to run transportation. In the area of community relations, the Cleveland defendants appointed a person without the experience or expertise to guarantee even a reasonable prospect of success. This pattern of hiring "insiders" without expertise or experience has been repeated too many times and in too many areas to constitute an isolated error in judgment.

This is not a case where the Board of Education or Superintendent Carlin were unaware of the need to employ persons who had a proven track record in the area of school desegregation and who had dealt with traditional institutional limitations and resistance. The record reveals that the Cleveland defendants have been advised repeatedly of the need to employ experts to remedy this situation and the foreseeable consequences if more qualified persons from the outside were not hired. As this Court wrote over one year ago: "The local defendants' failure to hire the appropriate experts has delayed effective planning long enough and can no longer persist. Desegregation implementation in September 1979 or even February 1980 will stand little chance of success unless experts are brought into the system." *Reed v. Rhodes*, 472 F.Supp. 612, 613–14 (N.D.Ohio 1979). The conduct of the Cleveland defendants in delegating substantial desegregation responsibilities to persons lacking the expertise to desegregate is indefensible. When considered against the great need for expertise and in the face of repeated recommendations from this Court, the Special Master, and others, the practice of employing persons without desegregation experience in key administrative positions constitutes the grossest form of negligence and represents an appalling abandonment of the responsibilities of the Board, the Superintendent, and the Deputy Superintendent for Desegregation Implementation.

This Court has had the opportunity to assess the conduct of the Cleveland defendants over the past four years. It has been characterized by a repeated and continuous failure of officials to comply with a previously issued decree and a lack of leadership that could be expected to turn the situation around in a reasonable time. *See Morgan v. McDonough, supra* at 533. The pattern of confrontation, resistance, and delay engaged in by the defendants already has impeded the effectiveness of the desegregation remedy in Phases I and II to the detriment of the pupils of the district. Under the Cleveland defendants, there is no reasonable assurance or even hope that the

orders of the Court designed to ensure that the desegregation remedy is implemented in a timely fashion will be obeyed. Nor does a prospect exist for eliminating the effects of racial discrimination root and branch.

### B.

The plaintiffs' motion of March 25, 1980 urged this Court to hold the Cleveland defendants in civil contempt for their failure to substantially comply with orders relating to desegregation implementation. Specifically the plaintiffs allege that the Cleveland defendants failed to comply with Court orders in the transportation area, with the visible result being the tremendous problems encountered in Phases I and II. Because of the Court's duty and inherent power to enforce compliance with lawful orders through civil contempt, *see e. g. Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966); *United States v. United Mine Workers*, 330 U.S. 258, 330–32, 67 S.Ct. 677, 713, 14, 91 L.Ed. 884 (1974) (Black and Douglas, JJ., concurring in part and dissenting in part), and its special responsibilities in a systemic reform case to ensure that constitutional conditions are achieved, the Order to Show Cause specified other areas to be addressed during the hearings on civil contempt and the Special Master's Report of January 31, 1980.

The purposes of a civil contempt proceeding are two–fold: to coerce the derelict party into compliance with court orders, and to compensate the prevailing party for losses or damages caused by the other's non–compliance. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *United States v. United Mine Workers, supra* at 304, 67 S.Ct. at 701; *Jim Walter Resources v. Inter. Union, Etc.*, 609 F.2d 165 (5th Cir. 1980). In appropriate cases, the civil contempt award may include "complainant's reasonable expenses in the proceedings necessitated in presenting the contempt for the judgment of the court." *Parker v. United States*, 153 F.2d 66, 71 (1st Cir. 1946); *see also Northside Realty Associates,*

Inc. v. United States, 605 F.2d 1348, 1356 (5th Cir. 1979); United States v. Greyhound Corp., 370 F.Supp. 881, 886 (N.D.Ill.), aff'd 508 F.2d 529 (7th Cir. 1974).

■ In civil contempt proceedings, "the basic proposition (is) that all orders and judgments of courts must be complied with promptly." Maness v. Meyers, 419 U.S. 449, 458, 95 S.Ct. 584, 591, 42 L.Ed.2d 574 (1975). While the violations of court orders need not be willful, McComb v. Jacksonville Paper Co., supra at 191, 69 S.Ct. at 499, they must constitute "failures in meaningful respects to achieve substantial and diligent compliance." Aspira v. Board of Education, 423 F.Supp. 647, 649 (S.D.N.Y.1976); see also Washington Metropolitan Transit Authority v. Amalgamated Transit Union, 531 F.2d 617, 621, 22 (D.C.Cir.1976). Clear and convincing evidence must establish that the defendants have violated a direct order of the court. Consolidation Coal Co. v. Local Union No. 1784, 514 F.2d 763, 766 (6th Cir. 1975); Northside Realty Associates, Inc. v. United States, 605 F.2d 1348, 1352 (5th Cir. 1978).

■ The relevant inquiry in a civil contempt proceeding is whether the defendants took "all the reasonable steps within their power to insure compliance with the orders." Sekaquaptewa v. MacDonald, 544 F.2d 396, 406 (9th Cir. 1976). Thus "a finding of civil contempt may be made if it is shown that a party has violated his obligations imposed by a court decree by a failure of diligence, ineffective control, and lack of purpose in effectuating the requirements of the decree." Jordan v. Arnold, 472 F.Supp. 265, 289 (M.D.Pa.1979). See also Palmigiano v. Garrahy, 448 F.Supp. 659 (D R.I 1978).

■ Of course, the alleged contemnor has the right to prove mitigating circumstances such as good faith and defenses such as inability to comply or substantial compliance. Washington Metropolitan Transit Authority v. Amalgamated Transit Union, supra; Aspira v. Board of Education, supra.

■ The Cleveland Board of Education, the Superintendent of Schools and the Deputy Superintendent for Desegregation Implementation are defendants subject to the remedial orders. Like corporate officials, they are responsible for doing everything they reasonably can to see that a court order is obeyed. Jordan v. Arnold, supra at 289; cf. United States v. Fleischman, 339 U.S. 349, 70 S.Ct. 739, 94 L.Ed. 906 (1950); United States v. Joyce, 498 F.2d 592 (7th Cir. 1974). And because these defendants have official responsibility for the conduct of their staff, they are required to take reasonable steps to insure that compliance actually occurs. The failure to comply with these duties can result in civil contempt. Jordan v. Arnold, supra at 289; United States v. Greyhound Corp., supra.

The record demonstrates clearly and convincingly that the Cleveland defendants were aware of and yet failed to comply with numerous court orders. In the area of transportation the Cleveland defendants failed to comply with the Order of December 21, 1977, by knowingly failing to place the operational division of transportation and planning within DDI and under the control of Dr. Fleming. See pp. 381, 382 supra.[23] The Cleveland defendants also have failed to provide an efficient system of transportation in contravention of the Remedial Order of February 8, 1978. See pp. 380, 385 supra.

The Cleveland defendants have failed to exercise reasonable diligence in staffing and equipping the Division of Transportation, with the result that the initial weeks of Phase II were disastrous and serious difficulties now confront Phase III transportation implementation. See Amicus Ex-

---

**23.** The claim that the Order of December 21, 1977 is ambiguous is refuted by the literal wording of the Order, subsequent events in this litigation, and perhaps most importantly, the testimony of Board President Gallagher, Superintendent Carlin, Dr. Fleming, and Business Manager Mazzaro that they understood the or-

der to be applicable. See p. 370 supra. In any event, "[Contempt cannot] be avoided by some literal or hypertechnical reading of an order. It is the spirit and purpose of an injunction, not merely its precise words, that must be obeyed." National Research Bur., Inc. v. Kucker, 481 F.Supp. 612, 615 (S.D.N.Y.1979).

hibit 561. While the Cleveland defendants have purportedly taken steps to purge the contempt (e. g. by the transfer of the Department of Transportation to DDI, by the appointment of Mr. Knisely as Transportation Director), the Court is not convinced that the present Board, Superintendent, and Deputy Superintendent for Desegregation Implementation will effectively implement Phase III transportation in a timely manner. This conclusion is reached upon consideration of the record of performance to date as opposed to the promises of performance which the defendants have made. This record of performance includes the repeated and knowing failure to provide a management structure and staff capable of carrying out the transportation component of the Remedial Order. Additionally, this finding is based on an assessment of the credibility of those who have testified: Board members, Superintendent Carlin, Dr. Fleming, and employees of the Cleveland Board of Education.

In the areas of community relations, educational components, and other ancillary relief, the Cleveland defendants have failed to timely and substantially implement the Remedial Order. *See* pp. 385, 396 *supra*. Given an organizational structure which impedes desegregation efforts and key operational divisions staffed by persons without sufficient skills to implement the remedy in their areas, there is no reasonable likelihood that compliance will be achieved under the current leadership and administration.

The evidence shows that the violations of the orders of this Court were not accompanied by either substantial compliance or good faith efforts. The defendants were aware of the validity and applicability of the Order of December 21, 1977, but simply chose to ignore it.[24] The Cleveland defendants also were aware of their duty to timely implement the educational components and community relations programs, and to provide an effective system of transportation but they delegated the responsibilities to those without the requisite experience or expertise. The actions by the defendants were not reasonable under the circumstances and provide no reasonable indicia of good faith.

Confronted with clear and convincing evidence of substantial failure to comply with the remedial orders of this Court, the Cleveland defendants claim that no civil contempt exists because of the absence of willful disregard or disobedience to orders of the Court. This claim ignores the crucial distinction between civil and criminal contempt. The defendants also contend that in numerous instances the civil contempt which may have existed has been purged by subsequent compliance.

Defendants are correct that non–compliance subsequently purged will not support a present finding of civil contempt. However their assertion that the defendants are in substantial compliance with the remedial orders is not supported in fact.[25]

The Court has been told repeatedly by the defendants over the past few years that

24. This is not the only failure of the defendants in regard to implementing the December 21, 1977 order. The defendants have failed to establish a DDI division for fiscal planning, management and resource identification as required by the Order. Furthermore the order specifies a division on educational strategies and training which has not been solidified within the organizational structure of the DDI.

25. On July 23, 1980 this Court held a hearing on the Special Master's Report of July 18, 1980. The Special Master's Report and the Court hearing were prompted by the submission by the Cleveland Board of Education on July 16, 1980 of a Report on Plan to Reinforce Operations of the Department of Desegregation Implementation and the Retention of Consultants. For several reasons, this effort by the defendants to purge themselves of civil contempt is insufficient. First, the structural changes made within DDI are in violation of the Order of December 21, 1977. Second, the impression derived from the Board's Report that the outside, expert consultants have or will be given a major role in planning and implementation is not supportable. Third, the structural changes in DDI do not themselves represent a comprehensive and satisfactory response to the deficiencies uncovered by the Special Master and by the Court during the hearings on civil contempt. *See also* letter of Dr. Gordon Foster to Dr. Margaret Fleming, July 18, 1980.

they are genuinely attempting to comply with remedial orders. In assessing the likelihood of compliance to lawful orders, the Court must be sensitive to the background of events leading up to the civil contempt proceedings. In this regard, the litany of occasions when Cleveland defendants have violated court orders need not be further specified in detail. They include the maintenance of one–race classrooms at Westropp Junior High School, the failure to timely file a student disciplinary code, and the failure to submit a school closings list and report. When compliance has finally occurred, frequently it was due only to court intervention. *See, e. g.* Order of February 7, 1979 Holding Cleveland Defendants in Civil Contempt, *vacated on due process grounds, sub nom. Reed v. Cleveland Board of Education*, 607 F.2d 749 (6th Cir. 1979). This course of conduct, which is marked by repeated failures to obey court orders, provides a benchmark for the Court to assess compliance. The Court is aware of the promises which the Cleveland defendants have made to ensure compliance in the future. It is also aware that for too many years it has seen those same promises broken or rendered meaningless. The entire record establishes clearly and convincingly that the Cleveland Board of Education has failed to exercise decisive and affirmative leadership to ensure that the school system is in compliance with court orders. The failure has been not just one of ineffective control and lack of diligence, but one of lack of purpose. The record is equally clear that Superintendent Carlin and Dr. Fleming have failed to implement the decrees. In appointing them, the Board has appointed persons unable to provide the direction and leadership necessary or to carry out the mandate of the Remedial Order. The defendants have appointed persons unable to carry out the desegregation planning and implementation tasks, have failed to supervise their performance, and have not taken the necessary steps to provide an organizational structure supportive of the desegregation plan. The record is bare of evidence suggesting that under the current leadership there exists any reasonable hope of substantial compliance in the future. The pervasive maladministration borders on reckless conduct and seriously undermines effective implementation of the Remedial Order. Under these circumstances, the Court has no alternative but to conclude that the Cleveland defendants are in civil contempt.

## IV.

The inability and unwillingness of the Cleveland defendants to implement the Remedial Order in an effective, timely, and educationally–sound manner has led the · United States to recommend the removal of the current Deputy Superintendent for Desegregation Implementation and the appointment of a Desegregation Administrator. This proposed relief varies from that proposed by the plaintiffs, who urge this Court to remove the current President of the Cleveland Board of Education from his leadership position for a period of five years. The plaintiffs and amicus are in agreement that the individual in charge of the administration of desegregation in Cleveland must possess substantially greater authority and autonomy if full implementation is ever to be more than a wishful dream in this generation.

The Court has considered at length the proposals forwarded by the plaintiffs and amicus and the objections articulated by the defendants. The Court is also conscious of its inherent duty to ensure that violations of the Constitution are remedied and that its orders are obeyed. In view of the letter and spirit of the following order, it is unnecessary that this Court determine the status of Deputy Superintendent Margaret Fleming as an employee of the Cleveland Board of Education.

Accordingly:

1. The Cleveland Board of Education shall employ an Administrator of Desegregation to be selected by this Court as soon as possible. All parties, as well as the amicus and the Special Master, may submit the names and resumes of prospective candidates to the Court on or before July 31,

1980. The retention or removal of Dr. Fleming as Deputy Superintendent of Schools for Desegregation Implementation is left to the Board of Education. Prior to the appointment of the Administrator, the local defendants shall continue to be responsible for planning and implementing the Remedial Orders, and they shall continue to be held accountable to this Court for their performance.

2. The Administrator of Desegregation shall have complete authority to direct the efforts, employees, and resources of the local defendants for the purpose of implementing the Remedial Orders of February 8 and June 16, 1978, including the authority granted the Deputy Superintendent for Desegregation Implementation in the Order of December 21, 1977. Specifically, the Administrator of Desegregation shall have authority to: (1) direct all District personnel, including the Superintendent of Schools, Treasurer, Business Manager and other administrators located at the administration building, and building level employees including principals, with respect to planning and implementing components of the remedial orders of this Court; (2) manage the Department of Desegregation Implementation as administrative head of this Department; (3) hire or transfer into or out of the Department of Desegregation Implementation any person currently employed therein or any person that the Administrator considers qualified for those tasks assigned to DDI; (4) review or cause to be reviewed the defendants' actual or proposed desegregation policies, budgets, reports, organization and staffing charts, regulations, directives, plans, grant applications, press releases, information documents, and personnel actions and based on such review to issue recommendations directly to the Board of Education or instructions to the Superintendent or Deputy Superintendent for Desegregation Implementation.

3. The Superintendent of Schools and Deputy Superintendent for Desegregation Implementation shall promptly provide the Administrator of Desegregation with all data, information, documents and similar materials in the possession of the local defendants which the Administrator may from time to time request, including but not limited to information and documents held by the Treasurer and Business Manager of the School District.

4. The Administrator of Desegregation is authorized access to all school buildings, transportation depots, warehouses and other properties owned or leased by the local defendants.

5. Compensation, Prerequisites, and Staff.

a. For purposes of indemnification, the Administrator of Desegregation shall be considered an employee of the local defendants. The local defendants shall indemnify the Administrator of Desegregation in the same fashion and to the same extent as the defendants indemnify the Superintendent of Schools.

b. The Administrator of Desegregation shall be paid a salary and receive fringe benefits equal to the salary and benefits of the Superintendent as of the date of this Order. The local defendants are responsible for such costs and shall disburse such salary payments and establish such fringe benefits promptly and efficiently.

c. The Superintendent of Schools is personally responsible for providing the Administrator of Desegregation appropriate certificated and clerical staff, office space, office equipment and office supplies as well as such transportation and security services as the Administrator may request.

6. The Court hereby enjoins the Board of Education, the Superintendent, the Deputy Superintendent of Desegregation Implementation, and all other administrators employed by the local defendants from interfering with the Administrator of Desegregation as the Administrator performs the duties set forth in this order. The Administrator of Desegregation shall report to the Court directly or through the Special Master any such interference or any other matter deemed to be of importance in achieving compliance with the Remedial Order. The Cleveland defendants shall be held personally liable for any acts of interference found by this Court.

7. The Administrator of Desegregation shall exercise the authority granted pursuant to this order only until, in the opinion of the Court, full implementation of the various directives of the Remedial Order is assured.

8. An opinion and order on the matter of attorney's fees and costs, if any, to be assessed against members of the Cleveland Board of Education, the Superintendent, and the Deputy Superintendent for Desegregation Implementation will follow seasonably.

IT IS SO ORDERED.

### ADDENDUM

On April 2, 1979 this Court ordered the United States to investigate several events to determine whether there was probable cause to believe that the Cleveland defendants had committed one or more criminal or civil contempts and authorized the United States to pursue civil and criminal remedies if the facts and circumstances so warranted. The Department of Justice concluded that in four areas probable cause exists to believe that defendants or their employees committed acts of criminal contempt. *See* Report of the United States Pursuant to the Court's Order of April 2, 1979 Concerning Criminal and Civil Contempt, filed November 14, 1979. Based on two factors —the affirmance by the Court of Appeals for the Sixth Circuit and the divisive potential inherent in prosecution for criminal contempt at the beginning of court–ordered implementation—the Department "decided to observe the progress of future events before finally resolving whether to prosecute." *Id.* at 3.

Events occurring since the filing of the Report indicate that the affirmance of liability and remedy by the Court of Appeals for the Sixth Circuit and the denial of certiorari by the Supreme Court has not spurred the defendants to act in accordance with the law. The testimony presented to the Court during these hearings reveals no change in attitude on the part of the defendants. The pattern of delay, frustration, and confrontation remains and contin-ues to inhibit court–ordered desegregation. The Cleveland defendants have stated publicly that the Department of Justice's findings of probable cause for criminal contempt prosecutions constitutes a "clear vindication" of their conduct. (Tr. 4286; Amicus Exhibit 573).

Based on the history of this litigation and the testimony presented during the hearings on civil contempt, this Court suggests that the Department of Justice reexamine its decision to employ prosecutorial discretion not to prosecute the Cleveland defendants for criminal contempt. Furthermore, the Department is urged to examine the transcript of these proceedings to ascertain whether there is probable cause to believe that perjury or other crimes have been committed. The transcript reveals what appear to be numerous misstatements and misrepresentations by the Cleveland defendants and their employees which may constitute probable cause for indictments of perjury.